BP AMERICA PRODUCTION
COMPANY, Petitioner,

v.

LADDEX, LTD., Respondent

No. 15-0248

Supreme Court of Texas.

Argued October 11, 2016

OPINION DELIVERED: March 3, 2017

Alfonso Antroy Arreola, Delilah Banks, Locke Lord LLP, James Russell Leahy, Greenberg Traurig LLP, Houston, Charles R. 'Skip' Watson Jr., Davis, Garald & Cremer, PC, Mike A. Hatchell, Susan A. Kidwell, Locke Lord LLP, Austin, Conrad D. Hester, Robert C. Vartabedian, Thompson & Knight, LLP, Fort Worth, John Ben Blanchard, Brown & Fortunato, P.C., Amarillo, for Petitioner.

Brian W. Farabough, Joe L. Lovell, Lovell Lovell Newsom & Isern, L.L.P., John T. Smithee, Templeton, Smithee, Hayes Heinrich & Russell, LLP, Ronald D. Nickum, Attorney at Law, Amarillo, for Respondent.

Justice Lehrmann delivered the opinion of the Court.

In this oil-and-gas case, we are asked to apply the rule against perpetuities to a top lease and to review the trial court's judgment terminating a bottom lease based on jury findings that the lease failed to produce in paying quantities over a specified period. The court of appeals held that the rule did not invalidate the top lease at issue and that the trial court erroneously charged the jury on the production-in-paying-quantities question, necessitating a new trial. We agree and affirm the court of appeals' judgment.

## I. Background

BP America Production Company acquired by assignment a 1971 oil-and-gas

lease (the BP lease) covering property in Roberts County, Texas. The lease had a primary term of five years and continued "as long thereafter as oil or gas is produced from said land hereunder." During the relevant time period, the BP lease had one producing well, the Mahler D-2. Beginning in August 2005, production from the Mahler D-2 slowed significantly for approximately fifteen months. In November 2006, the well resumed producing in quantities comparable to those before the slowdown.

During the period of slowed production, an attorney for the lessors, Ron Nickum, believed that there had been a total cessation of production from the well. In April 2006, he sent BP a letter stating, "[i]t appears that [the BP] lease has terminated by reason of failure to produce in paying quantities and cessation of production." The letter went on to warn:

> Any farmout or assignment in the terminated lease, or any additional drilling, reworking, or other development under the terminated lease, is taken at your own risk.
>
> ... Any further payment of royalty will simply be considered a partial payment of all monies due from production and sale of hydrocarbons ... rather than a ratification or revivor of the terminated lease described above.

Nickum concluded the letter with a request for a BP agent to contact him to discuss the matter. BP did not respond.

In March 2007, approximately five months after the well resumed pre-slowdown production levels, the lessors under the BP lease entered into a top lease with Laddex, Ltd. (the Laddex lease) covering the same property as the BP lease.[1] The Laddex lease provided in pertinent part:

> It is agreed that this is a top lease and, subject to the other provisions herein contained, the primary term of this lease shall commence [ (a) ] upon the date that written releases are filed in the official public records of the county in which the land is located by all owners of record of the prior terminated lease, releasing the last recorded prior now-terminated lease (the "base lease"); or (b) upon the date upon which a judgment of a court of competent jurisdiction terminating the base lease and all interests under the base lease becomes final and nonappealable. This Lease is intended to and does include and vest in Lessee any and all remainder and reversionary interest and after-acquired title of Lessor in the Leased Premises upon expiration of any prior oil, gas or mineral lease....

A month after the Laddex lease was executed, Laddex sued BP, alleging that the BP lease had terminated for failure to produce in paying quantities in 2005 and 2006.[2] BP moved to dismiss the case for lack of subject-matter jurisdiction, arguing that Laddex lacked standing to bring its claims because the purported source of that standing—the Laddex lease—violated

**1.** "Basically, a top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease." Michael L. Brown, *Effect of Top Leases: Obstruction of Title and Related Considerations*, 30 BAYLOR L. REV. 213, 213 (1978). The prior lease is commonly referred to as a bottom lease.

**2.** In its original petition, Laddex alleged termination due to complete cessation of pro-

duction from June 2001 through June 2002. Laddex amended its petition several times to add and remove allegations of both complete cessation of production and failure to produce in paying quantities over various periods. The case was ultimately submitted to the jury only on Laddex's claim that the BP lease terminated for failure to produce in paying quantities from August 2005 through October 2006.

the rule against perpetuities and was therefore void. The trial court denied the motion, and the case proceeded to a jury trial on the merits.

The court's charge to the jury asked whether the Mahler D-2 failed to produce in paying quantities "[f]rom August 1, 2005 to October 31, 2006" and whether, "under all the relevant circumstances, a reasonably prudent operator would not continue, for the purpose of making a profit and not merely for speculation, to operate the Mahler D-2 Well in the manner in which it was operated between August 1, 2005 to [sic] October 31, 2006." The jury answered yes to both questions. The jury also found that Nickum's April 2006 letter did not "repudiate BP's title to the [BP] lease." The trial court rendered judgment on the verdict, decreeing that the BP lease "has lapsed and terminated for failing to produce in paying quantities" and granting Laddex possession of the pertinent mineral estate. BP appealed.

The court of appeals agreed with the trial court that Laddex had standing, but reversed the judgment based on charge error and remanded for a new trial. 458 S.W.3d 683 (Tex. App.—Amarillo 2015). On the standing issue, the court of appeals held that the Laddex lease was not subject to the rule against perpetuities because it conveyed to Laddex a vested interest in the lessors' possibility of reverter. *Id.* at 686–87. As to the jury charge, the court of appeals held that the trial court erred in limiting the jury's paying-production inquiry to the specific fifteen-month period in which production slowed. *Id.* at 688. Noting that the controlling issue was whether the well failed to produce in paying quantities over a reasonable period of time and that the Mahler D-2 had undisputedly resumed paying production by the time the Laddex lease was executed, the court of appeals concluded that the charge "limited

the jury's consideration to a period of time that was not reasonable." *Id.* Finally, the court rejected BP's challenge to the legal sufficiency of the evidence to support the verdict, holding that the record revealed "sufficient evidence to have allowed a reasonable jury to differ as to whether the lease produced in paying quantities when a reasonable period of time is considered." *Id.* at 689.

BP and Laddex each filed a petition for review complaining of the court of appeals' judgment. Laddex argues that the jury was properly instructed and the trial court's judgment should have been affirmed, while BP maintains that judgment should be rendered in its favor, either because Laddex lacks standing or because no evidence supports the jury's findings regarding the Mahler D-2's cessation of production in paying quantities. We granted both petitions.

## II.  The Rule Against Perpetuities

BP challenges Laddex's standing to seek termination of the BP lease, arguing that the top lease on which such standing depends is void as a perpetuity. Because lack of standing deprives the court of subject-matter jurisdiction, we address this issue first. *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005).

The Texas Constitution prohibits perpetuities as "contrary to the genius of a free government." Tex. Const. art. I, § 26. This prohibition is embodied in the common-law rule against perpetuities (Rule), which provides that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance." *Peveto v. Starkey*, 645 S.W.2d 770, 772 (Tex. 1982). In applying the Rule, we look at the conveyance instrument as of the date it is executed, "and it is void if by any possible contingency the grant or de-

vise could violate the Rule." *Id.* However, we also recognize "that where an instrument is equally open to two constructions, the one will be accepted which renders it valid rather than void, it being assumed that a grantor would intend to create a legal instrument rather than one which is illegal." *Kelly v. Womack*, 153 Tex. 371, 268 S.W.2d 903, 906 (1954).

■ Importantly, the Rule does not apply to present interests or to future interests that vest at their creation. *See id.* at 905–06 ("The requirement of the rule in this respect is complied with when a future estate or interest becomes vested in interest regardless of when it becomes vested in possession."). Accordingly, we must examine the nature of the interest conveyed under the Laddex lease to guide our determination of whether the Rule applies.

"In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee." *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991). "A possibility of reverter is the interest left in a grantor after the grant of a fee simple determinable." *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991); *Luckel*, 819 S.W.2d at 464 (explaining that the possibility of reverter is "the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs"). The possibility of reverter, though not presently possessory, is presently vested at the time the lease is executed. *See Snow*, 819 S.W.2d at 468.

Under this well-established framework, the BP (bottom) lease conveyed the lessors' mineral estate to BP's predecessor as a determinable fee, subject to a vested possibility of reverter in the lessors. And we have recognized that a lessor may sell or assign all or part of the possibility of reverter. *Id.* at 468–69. In turn, Laddex contends that the lessors conveyed their vested reversionary interest in the mineral estate to Laddex via the Laddex (top) lease. *See* Michael L. Brown, *Effect of Top Leases: Obstruction of Title and Related Considerations*, 30 BAYLOR L. REV. 213, 239 (1978) (noting that a top lease "may be classified as a partial alienation of a possibility of reverter," in that "a lessee under a top lease acquires the lessor's possibility of reverter to the extent that what he has acquired is capable of ripening into a fee simple determinable interest upon expiration of the bottom lease" (emphasis omitted)). BP responds that, to the extent the Laddex lease conveyed the lessors' possibility of reverter, the lease's language delayed the vesting of that interest until the occurrence of an uncertain future event—expiration of the BP lease. Thus, BP argues that the top lease violates the Rule and is void.

■ As an initial matter, we agree with BP that a top-lease conveyance contingent on expiration of a determinable-fee bottom lease, without more, generally violates the Rule.[3] In *Peveto*, we analyzed a royalty

---

3. To aid compliance with the Rule, commentators have suggested inserting a provision stating that the top lease will terminate on a date certain within the Rule period if the conveyance does not become effective by that date. *See* 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL & GAS § 4.2[C], at 4-23 (June 2016) (suggesting a provision stating that the top lease will automatically terminate if the bottom lease has not expired within a set time period after expiration of the primary term); Nelson Roach, *The Rule Against Perpetuities: The Validity of Oil and Gas Top Leases and Top Deeds in Texas After* Peveto v. Starkey, 35 BAYLOR L. REV. 399, 410 (1983) (suggesting a provision stating that the top lease will "become effective immediately upon termination of the [bottom lease], but no longer than 21 years from [the execution] date"); *cf. Conquistador Petroleum, Inc. v. Chatham*, 899

"top deed" that conveyed a term royalty interest to Starkey. 645 S.W.2d at 771. The top deed stated that "[t]his grant shall become effective only on the expiration of" an existing royalty deed. *Id.* The existing royalty deed had conveyed a determinable fee to Peveto; that deed had a primary term of fifteen years and continued "as long thereafter as" minerals were produced in paying quantities. *Id.* We explained that the "words used" in the top deed "postpone[d] the vesting of Starkey's interest until some uncertain future date"—specifically, the date of the determinable fee's termination—that might never arrive. *Id.* at 772. Accordingly, we held that the top deed "created a springing executory interest" that "may not vest within the period of the Rule" and was therefore void. *Id.*

The Amarillo Court of Appeals relied on *Peveto* to invalidate top leases that "expressed an intent to preclude a present conveyance of any interest whatsoever to the lessee." *Hamman v. Bright & Co.*, 924 S.W.2d 168, 172 (Tex. App.—Amarillo 1996, writ granted w.r.m.). The top leases at issue in *Hamman* contained a provision stating that "during the existence and continuance of [the bottom] lease[,] the rights, interests, estate, privileges and royalties, as fixed thereby, of said Lessors shall remain vested in and held and possessed by said Lessors." *Id.* (emphasis omitted). Because the top leases conveyed interests that would vest in the lessee only upon expiration of the bottom lease, such that those interests had the potential to vest outside the Rule period, the court of appeals held that the top leases violated the Rule and were void. *Id.* at 172–73. The court's holding in *Hamman* reflects a

sound application of our reasoning in *Peveto* and the Rule itself.

■ That a top lease may violate the Rule, however, does not mean that the Laddex lease necessarily does. We turn to the provisions of that lease, as the "rights of the parties are governed by the language used." *Peveto*, 645 S.W.2d at 772. Consistent with the Laddex lease's classification as a top lease, its primary term commences on the date that either (1) releases of the BP lease executed by all owners of record are filed in the real property records, or (2) a judgment terminating the BP lease becomes final and nonappealable. Under this provision, Laddex has no right to *possession* of the mineral estate until the BP lease is released or adjudged terminated. The Laddex lease goes on to state: "This Lease is intended to and does include and vest in Lessee any and all remainder and reversionary interest and after-acquired title of Lessor in the Leased Premises upon expiration of any prior oil, gas or mineral lease...." This provision forms the crux of the parties' dispute. Laddex maintains that the lease presently conveys the lessors' possibility of reverter, while BP argues that the lease language expressly delays the vesting of that reversionary interest until the expiration of the BP lease, such that the interest could vest outside the Rule period.

The Laddex lease is not a model of clarity. For example, in one provision, it states that the primary term lasts for "three years from this date," i.e., the lease's effective date of January 1, 2007; in another, quoted above, the primary term is said to commence on the date the BP lease is either released or terminated by final judgment. Further, leaving aside the par-

S.W.2d 439, 442–43 (Tex. App.—Eastland 1995, writ denied) (holding that an option to lease property subject to an existing lease did not violate the Rule where the option was

contingent on the existing lessees' declining to renew their lease within ten days of the fixed primary term's expiration). The Laddex lease contains no such provision.

ties' dispute about the time of vesting, the Laddex lease purports to convey to Laddex "any and all remainder and reversionary interest" of the lessors. Taken at face value, this language appears to convey the lessors' entire possibility of reverter to Laddex, which would leave Laddex with fee simple title to the minerals upon the BP lease's expiration and the lessors with nothing. *See Luckel*, 819 S.W.2d at 464 (noting that the possibility of reverter is "the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs"). But viewed as a whole the lease does not convey the entire possibility of reverter. Rather, it conveys to Laddex the typical determinable fee associated with an oil-and-gas lease, containing a primary and secondary term, a partial-reverter clause, and other standard oil-and-gas lease terms.

With this in mind, we return to the provision at issue stating that the Laddex lease "is intended to and does include and vest in Lessee any and all remainder and reversionary interest and after-acquired title of Lessor in the Leased Premises upon expiration of any prior oil, gas or mineral lease." We conclude that a plausible interpretation of this language is that the Laddex lease is a present "partial alienation" of the lessors' possibility of reverter under the BP lease, to the extent that what Laddex has acquired "is capable of ripening into a fee simple determinable interest upon expiration of the [BP] lease." Brown, 30 BAYLOR L. REV. at 239. BP's interpretation—that the vesting of Laddex's interest is contingent on the BP lease's expiration—is also plausible. As noted, "where an instrument is equally open to two constructions, the one will be accepted which renders it valid rather

than void, it being assumed that a grantor would intend to create a legal instrument rather than one which is illegal." *Kelly*, 268 S.W.2d at 906. We do so here and hold that the Laddex lease is a present conveyance of a vested interest that does not violate the Rule.[4] Indeed, under BP's interpretation the disputed provision—expressly vesting the remainder and reversionary interest in Laddex—serves no purpose other than to *ensure* the lease violates the Rule. Particularly given the lack of clarity, we conclude the proper approach is to interpret the vesting language as an attempt to *avoid* violating the Rule. We hold that Laddex had standing under its lease to bring this suit.

### III. Production in Paying Quantities

The parties' remaining disputes involve the jury's finding that the Mahler D-2 well failed to produce in paying quantities and the court of appeals' remand for a new trial. Before discussing the specific arguments, we reiterate the framework under which we evaluate claims involving cessation of production in paying quantities.

The BP lease is in its secondary term and continues as long as oil or gas is "produced," which we have interpreted to mean produced in paying quantities. *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 511 (1942). Whether a well is producing in paying quantities is a question of fact for the jury, and the burden is on the lessor to prove a lack of such production in order to terminate the lease. *See Skelly Oil Co. v. Archer*, 163 Tex. 336, 356 S.W.2d 774, 782–83 (1961). In *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959), we expounded a two-pronged analysis to answer this question, holding that whether a well is produc-

---

4. As the court of appeals noted, the issue of whether the lessors' possibility of reverter un-

der the Laddex lease violates the Rule is not presented.

ing paying quantities depends on (1) whether the well "pays a profit, even small, over operating expenses," *id.* at 691 (citation omitted), and (2) if not, whether, "under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation," continue to operate the well as it had been operated, *id.*; *see also Skelly Oil*, 356 S.W.2d at 783. As discussed further below, we emphasized in *Clifton* that "there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased." 325 S.W.2d at 690.

In this case, the jury charge contained separate questions, with accompanying instructions, for each prong of the *Clifton* analysis. Question 1 asked:

From August 1, 2005 to October 31, 2006, did the Mahler D-2 Well fail to produce in paying quantities?

You are instructed that where production is sufficient to yield a return in excess of operating and marketing costs over a reasonable period of time, the well is producing in paying quantities even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss.

You are further instructed that "operating and marketing costs" include expenses such as taxes, overhead charges, labor, repair, depreciation on salvageable equipment, and periodic expenditures which were allocated to this well and which were used on this well in order to produce or keep it producing. You shall not consider any costs or expenses incurred in connection with the original drilling or rework of the well.

You are further instructed that "overhead charges" do not include administrative or district costs that would continue whether or not the well is producing.

You are further instructed that "depreciation of salvageable equipment" does not represent bookkeeping depreciation; rather, it is the actual physical depreciation in the salvage value of on-location production equipment as the result of continued operations.

You are further instructed not to consider any capital expenses in determining whether the production from the well over a reasonable period of time yields a profit after deducting operating and marketing costs. Capital expenses mean one-time investment expenses, such as drilling and equipping costs.

The jury found, "Yes, the Mahler D-2 Well failed to produce in paying quantities." Question 2, premised on an affirmative answer to Question 1, asked:

Do you find that, under all the relevant circumstances, a reasonably prudent operator would not continue, for the purpose of making a profit and not merely for speculation, to operate the Mahler D-2 Well in the manner in which it was operated between August 1, 2005 to [sic] October 31, 2006?

You are instructed that in deciding whether a prudent operator would not continue, for profit and not merely for speculation, to operate the well in the manner in which it was operated, you must take into consideration all matters which would influence a reasonably prudent operator. Some of the factors are:

- the depletion of the reservoir and the price for which the lessee is able to sell his produce;
- the relative profitableness of other wells in the area;
- the operating and marketing costs of the lease;
- the operator's net profit;

- the lease provisions;
- a reasonable period of time under the circumstances; and
- whether or not the lessee is holding the lease merely for speculative purposes.

The jury found, "Yes, a reasonably prudent operator would not continue to operate the Mahler D-2 Well." Based on this verdict, the trial court rendered judgment declaring the BP lease terminated.

As noted, the court of appeals held that Question 1 was erroneous because it limited the jury's consideration to the fifteen months of slowed production and, in turn, did not allow the jury to consider the well's return to profitability following that window. 458 S.W.3d at 689. The court remanded for a new trial upon concluding that the record evidence would "have allowed a reasonable jury to differ as to whether the lease produced in paying quantities when a reasonable period of time is considered," although the court expressly declined to determine "what would be an appropriate period of time in this case." *Id.* at 688 n.3 & 689.

BP agrees with the court of appeals that the question was erroneous, but argues that rendition in its favor rather than remand is warranted because the evidence conclusively establishes the lease's profitability over a reasonable period of time. BP argues that a reasonable time period under the circumstances would be, "at a minimum," the 27 months preceding Laddex's filing suit in April 2007, which would include several months before and after the slowdown. BP notes that, even taking into account all the expenses utilized by Laddex's experts (some of which BP disputes), the lease maintained a cumulative profit in all but one of those months. BP complains

that Laddex's experts' testimony about cessation of production in paying quantities was "incompetent and thus, 'no evidence'" because the experts had no basis on which to ignore the lease's return to profitability.

Laddex responds that, even accepting BP's challenges to certain expenses considered by Laddex's experts, the evidence supports the jury's finding that the well operated at a loss during the fifteen-month slowdown. Laddex contends that the trial court "acted properly in stating the period over which Laddex alleged there was a lack of paying production and instructing the jury that the measuring period must be reasonable." Laddex notes that trial evidence was presented regarding well production and profitability before and after the stated period, and the jury thus considered periods of profitable production in making its findings. Moreover, Laddex argues, the lease automatically terminated following a reasonable period of unprofitable production,[5] and any subsequent profitable production is therefore immaterial to the issue. In other words, Laddex argues that the appropriate period to be analyzed is that in which there is evidence of nonpaying production, and the jury must decide if that period is reasonable under the circumstances.

Both parties' positions run afoul of *Clifton*. In that case, the lease's primary term ended in 1950, and the operator commenced reworking operations on the well on September 12, 1956. *Clifton*, 325 S.W.2d at 688. After a bench trial, the trial court found that the well on the leased premises "had at all material times produced gas in paying quantities," and the issue was whether any record evidence existed to sustain that finding. *Id.* Because the lease contained a clause foreclosing termination

---

5. Notwithstanding this argument, Laddex does not contend that it is entitled to possession of the mineral estate before obtaining a final judgment terminating the BP lease.

based on a cessation of production so long as reworking operations were commenced within sixty days of such cessation, we considered whether there was evidence of paying production through July 12, 1956. *Id.* at 689. In holding that there was, we considered record evidence of monthly and aggregate profits and losses throughout 1954, 1955, and the first six months of 1956. *Id.* We rejected the lessors' argument that the sixty-day clause had any relevance to "the period over which the trier of the facts must determine whether a lease is producing in paying quantities," noting that such a clause comes into effect only in the event paying production has already ceased. *Id.* at 690. We continued:

> There can be no arbitrary period for determining the question of whether or not a lease has terminated for the additional reason that there are various causes for slowing up of production, or a temporary cessation of production, which the courts have held to be justifiable. We again emphasize that *there can be no limit as to time*, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased.

*Id.* (emphasis added) (internal citations omitted).

Unlike in *Clifton*, the BP lease's sixty-day clause is not at issue here. However, *Clifton* governs our analysis in this case because it more broadly addressed "the question of over what period of time paying quantities should be determined." *Id.* And, again, we were clear that "there can be no limit as to time . . . to be taken into consideration" in making that determination. *Id.* This holding undercuts the parties' contentions about the effect of the well's pre- and post-slowdown profitability: Laddex erroneously argues that it is immaterial,[6] while BP erroneously argues that it is dispositive. The trial court properly allowed the parties to present evidence of profitability before, during, and after the slowdown, but ultimately asked the jury to evaluate production in paying quantities only as to the specific period in which production slowed. We agree with the court of appeals that this was error under *Clifton*.

BP makes two alternative arguments in this Court about how the jury should have evaluated paying production. First, BP argues that evaluating the question with respect to any particular time period violates *Clifton*. Alternatively, BP contends that the trial court should have selected a period that included additional time before and after the slowdown, rather than the "arbitrary" period selected by Laddex and its experts that included only the months of slowed production.[7] For the reasons discussed, we agree with the first argument. Narrowing the question on paying production to any particular time period is necessarily "arbitrary."[8] *Id.*; *see* 1 ERNEST E.

---

6. Laddex cites several cases involving nonproduction due to sudden stoppage or an equipment malfunction, and the implied temporary-cessation-of-production doctrine that saves such leases from termination if the lessee shows that it acted reasonably to remedy the defect and restore production. *E.g., Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941). These cases are inapposite to situations involving cessation of production in paying quantities, which arise when a well is marginally producing and in which the burden is on the lessor to prove the elements set out in *Clifton*. *See Skelly*, 356 S.W.2d at 778.

7. BP argued at the charge conference that "if the Court is going to submit dates at all," it should "use the dates that [BP] requested, January 1, 2005 to January 1, 2007."

8. We recognize that other lease provisions, such as the sixty-day clause at issue in *Clifton*, may affect the paying-production analysis. As noted, applying the sixty-day clause in *Clifton* required us to determine whether paying pro-

Smith & Jacqueline Lang Weaver, Texas Law of Oil & Gas § 4.4[A][2][b], at 4-40 (Nov. 2009) ("Unless the lease defines the period for which production in paying quantities is measured, a well's profitability is not determined by looking at any specific accounting period."). And the chosen period can significantly influence the jury's verdict, which enjoys great deference on appeal.

■ Laddex insists that the jury's verdict should be upheld because the jury found that the submitted fifteen-month window was a reasonable time period over which to evaluate paying production. This argument is based on the instruction accompanying Question 1—which, again, asked whether the well failed to produce in paying quantities "[f]rom August 1, 2005 to October 31, 2006"—that a well is producing in paying quantities "where production is sufficient to yield a return in excess of operating and marketing costs over a reasonable period of time." We disagree. First, as BP objected at the charge conference, the submission served to "focus the jury" on the period of slowed production and then "imply that that is a reasonable time period." Moreover, even if the jury had been instructed more directly that the designated time period had to be reasonable,[9] the question would still improperly direct the jury toward a specific period

instead of allowing it to evaluate cessation of paying production with "no limit as to time . . . to be taken into consideration."[10] *Clifton*, 325 S.W.2d at 690.

That said, certainly the parties were entitled to (and did) attempt to focus the jury in this way through evidence and argument. Laddex had every right to argue to the jury that paying production had ceased because (1) costs exceeded revenue during the fifteen-month period of slowed production and (2) a reasonably prudent operator would not continue to operate the well for profit in light of the slowdown. And BP had every right to contest both of these points by arguing to the jury that the slowdown period did not accurately reflect the lease's profitability in light of the volume of production before and after this window. But the *charge* may not ask or instruct the jury about a specific period without unduly influencing the jury and violating *Clifton*.

■ Accordingly, we conclude that the charge in this case did not permit the jury to appropriately discharge its fact-finding duties, and we cannot say that a properly instructed jury could have reached only one verdict. Both sides presented evidence about the well's production and profitability that could have supported a verdict in either party's favor.[11] BP argues that Lad-

---

duction had ceased more than sixty days before reworking operations were commenced. 325 S.W.2d at 689. The parties point to no lease provisions in this case that impact the period over which to evaluate production in paying quantities.

9. At the charge conference, after BP made its objection, Laddex submitted an additional instruction stating, "To find that the Mahler D2 well failed to produce in paying quantities from August 1, 2005 to . . . October 31, 2006, you must determine that this period of time is a reasonable period of time under the circumstances." BP objected, and the trial court refused the instruction.

10. As Question 2 reflected, a "reasonable period of time under the circumstances" is pertinent to the second prong of the *Clifton* analysis. Specifically, it is one of the factors to be considered in determining whether a reasonably prudent operator would continue to operate the well for the purpose of making a profit and not merely for speculation. *Clifton*, 325 S.W.2d at 689.

11. BP argues that Nickum's April 2006 letter constituted a repudiation of the BP lease and that Laddex was barred from utilizing the lease's profitability (or lack thereof) after that date to support termination. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 157

dex's experts refused even to consider the well's return to profitability, "condemn[ing] their testimony as incompetent, and thus, as no evidence." However, the record shows that Laddex's experts *did* consider this return to profitability; they simply reached a different conclusion than BP's experts about its impact on the paying-production analysis. BP also argues that Laddex presented no evidence to support a cessation-of-paying-production finding because its experts deducted improper costs in opining on the well's profitability. But the disputed expenses are not dispositive of the ultimate question, and, in any event, Laddex presented evidence of the well's profitability both with and without those expenses.[12] Because a reasonable jury could have differed as to whether the well ceased to produce in paying quantities under the *Clifton* standard, remand for a new trial is appropriate.

## IV. Conclusion

We hold that Laddex's top lease does not violate the rule against perpetuities and that Laddex thus had standing to file this suit. We further hold that the trial court erred in charging the jury on cessation of production in paying quantities and that the court of appeals correctly remanded for a new trial. Accordingly, we affirm the court of appeals' judgment.

---

(Tex. 2004). We disagree. The jury found that the lessors did not repudiate the lease, and we cannot say that Nickum's letter, which stated that "[i]t appears that this lease has terminated" and asked BP to contact him to discuss the matter, conclusively establishes the "unqualified notice" of termination required to support a repudiation defense. *See Adams v. Cannan*, 253 S.W.2d 948, 951 (Tex. Civ. App.—San Antonio 1952, writ ref'd) (holding that a letter stating that "it would seem that the lease has terminated" did not present the requisite clear, unequivocal challenge to the lessees' title).

12. BP does not contend that the jury was improperly instructed on which expenses should be deducted.