# Supreme Court of Texas

No. 23-0927

David W. Cromwell,

*Petitioner*,

v.

Anadarko E&P Onshore, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

**Argued February 18, 2025**

JUSTICE SULLIVAN delivered the opinion of the Court.

The habendum clause that can be found in any oil-and-gas lease proves that true Texans can use Latinisms, too. "The clause beginning 'to have and to hold' is the habendum and tenendum combined, though it is traditionally called the *habendum* . . . ." BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 395 (2d ed. 1995).

This case concerns a pair of oil-and-gas leases, each of which had a habendum clause with somewhat different wording. But mistakes were made, perhaps, in that each habendum clause was written in the

passive voice. *See* BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 676–77 (4th ed. 2016) (unpacking the term "passive voice"). And so we confront two oil-and-gas leases that say they'll continue so long as minerals are produced from the land—yet they don't specify who has to do the producing. Must Cromwell himself, who holds the leases, *personally* produce minerals to maintain his interests?

As we read the plain language of these two habendum clauses, the answer is *No*. In interpreting mineral leases, as with other contracts, we will not squint to discover requirements that the parties themselves chose not to write into the memorialization of their bargain. It is undisputed here that production in commercial paying quantities continuously occurred on the leased land, so Cromwell's leases did not terminate for lack of production. We reverse the judgment of the court of appeals and remand for the trial court to address the parties' remaining arguments.

# I

David W. Cromwell and Anadarko E&P Onshore, LLC are oil-and-gas co-tenants, both owning shares of the working interest on the same land in Loving County, Texas.[1] Anadarko is a major oil-and-gas operator in the area. Before Cromwell obtained his interests, Anadarko already owned a working interest in the land and had completed the drilling of three wells: the Hughes & Talbot 75-23-1,

---

[1] "A working interest is the right to share in well production, subject to the costs of exploration and development." *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 180 n.2 (Tex. 2012) (quoting *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 543 n.2 (Tex. App.—Austin 1999, pet. denied)).

the Hughes & Talbot 75-25-1, and the Hughes & Talbot 75-26-1. Anadarko drilled additional wells on the land after Cromwell obtained his interests. The parties agree that at all relevant times, production in commercial paying quantities occurred on the land.

Cromwell, as the lessee, executed two leases—one with Carmen Ferrer and one with the Tantalo Trust—in February and March 2009, respectively. Both leases were paid-up, meaning they did not require Cromwell to commence drilling or pay delay rentals during the primary terms. The leases begin by detailing the purpose for which the lessors executed the leases. Ferrer executed the lease "exclusively unto [Cromwell] . . . for the purpose of exploring by geological, geophysical and all other methods, and of drilling, producing and operating wells for the recovery of oil, gas and other hydrocarbons . . . that may be produced from any well on the leased premises." Similarly, the Tantalo Trust executed the lease "unto [Cromwell] for the sole and only purpose of exploring, drilling, operating power stations, and construction of roads and structures thereon to produce, save, care for, treat and transport oil, gas and liquid hydrocarbons from the . . . land."

At issue here are the leases' habendum clauses. The Ferrer Lease's habendum clause provides:

> This lease . . . shall be in force for a term of **three (3)** years from this date (called "primary term") and as long thereafter as oil, gas or other minerals are produced from said land, or land with which said land is pooled hereunder, or as long as this lease is continued in effect as otherwise herein provided.

3

The Tantalo Lease's habendum clause provides:

> Subject to other provisions contained herein, this lease shall be for a term of five (5) years from the date first above written (hereinafter called the "primary term") and as long thereafter as oil, gas, liquid hydrocarbons or their constituent products, or any of them, is produced in commercial paying quantities from the lands leased hereby.

After Cromwell obtained his interests, he submitted the leases to Anadarko and asked to participate in the three wells Anadarko had already drilled and any well it planned to drill. Anadarko did not respond. From 2009 to 2018, Cromwell asked Anadarko eight to ten times to enter a joint operating agreement and participate in production, but Anadarko never provided Cromwell with a joint operating agreement.

When the 75-26-1 well reached payout in August 2009, Anadarko asked Cromwell to confirm his net working interest in the well.[2] The next month, Anadarko began sending Cromwell monthly joint interest invoices (also called joint interest billings), itemizing Cromwell's share of revenues and expenses for the 75-26-1 well. In months when revenues exceeded costs, Anadarko paid Cromwell his share of the proceeds, and in months when costs exceeded revenues, Cromwell paid his share of the costs. The parties proceeded in this manner from September 2009 through this lawsuit.

---

[2] A well reaches payout when the operator recovers the costs of drilling and completing the well from its production. *Stable Energy*, 999 S.W.2d at 543 n.2.

4

Anadarko also sent Cromwell an authorization for expenditure "[p]ursuant to the terms of the governing Operating Agreement" allowing him to elect to participate in the installation of a new compressor in the 75-26-1 well. Cromwell signed the authorization and paid his share of the expenditure. Anadarko claims that it sent Cromwell the authorization by mistake because Cromwell had not entered a joint operating agreement and was therefore a non-committed working interest owner. Cromwell, however, believed that if Anadarko drilled more wells, it would allow him to participate in production. Anadarko's correspondence with Cromwell referred to him as a "working interest owner" in the 75-26-1 well. Anadarko claims that its billing system provided no way to distinguish between committed and non-committed working interest owners.

The primary terms of the Ferrer Lease and the Tantalo Lease ended in February 2012 and March 2014, respectively. Anadarko argues that the leases terminated at those points because Cromwell failed to personally cause production on the land. Despite Anadarko's claim that Cromwell no longer had an interest in the land, it continued to "mistakenly" send him joint interest invoices. And in July and August 2016, Anadarko "discovered" that Cromwell's leases had expired. Anadarko did not tell Cromwell that it believed his leases had expired but continued sending him joint interest invoices and maintaining internal records that indicated Cromwell was a working interest owner with leases "held by production."

In 2017, under the belief that Cromwell's leases had terminated, Anadarko acquired top leases from Cromwell's lessors covering his

interests.[3] Anadarko did not tell Cromwell about this until over a year later when Cromwell requested information about his interest in another well. Anadarko responded by informing Cromwell that "[d]ue to the passage of time" and "never receiv[ing] from [Cromwell]" a joint operating agreement or authorization for expenditure, his leases had "expired" and his interests had been leased to "[third] parties thereafter," namely, to Anadarko.

Cromwell sued Anadarko for declaratory relief and trespass to try title, among other causes of action. Both parties moved for summary judgment on whether Cromwell's leases terminated. The trial court granted Anadarko's motion, denied Cromwell's, and rendered judgment that Cromwell take nothing.

The court of appeals affirmed, holding that Cromwell's leases automatically terminated at the end of their primary terms.[4] 676 S.W.3d 860, 874 (Tex. App.—El Paso 2023). Under that court's *Cimarex* decision, "Cromwell was required to 'take some action to cause production' on the leased property to keep his leases alive, despite the use of the passive voice in the habendum clause of each of his leases." *Id.* at 872 (quoting *Cimarex Energy Co. v. Anadarko Petroleum Corp.*,

---

[3] "[A] top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease." *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 478 n.1 (Tex. 2017) (quoting Michael L. Brown, *Effect of Top Leases: Obstruction of Title and Related Considerations*, 30 BAYLOR L. REV. 213, 213 (1978)).

[4] The court of appeals also affirmed the take-nothing judgment on Cromwell's partnership-based claims (*i.e.*, breach of fiduciary duty, fraud, and accounting under Section 152.211 of the Texas Business Organizations Code). 676 S.W.3d at 877. Cromwell does not challenge the court of appeals' holdings on these claims, so we do not address them.

6

574 S.W.3d 73, 93 (Tex. App.—El Paso 2019, pet. denied)). The court determined that Cromwell's payment of monthly joint interest invoices and an authorization for expenditure merely reflected his payment of the operating expenses typically owed by a non-participating co-tenant. *Id.* at 872–73. Anadarko's referring to Cromwell as a "working interest owner" and sending him an authorization for expenditure subject to their "operating agreement" did not amount to Cromwell's participation in a joint operating agreement. *Id.* at 873–74. And Anadarko's treatment of Cromwell as if his leases continued in effect (by continuing to send him joint interest invoices and communicating with him as if his leases were ongoing) could not change the leases' "unambiguous . . . terms under which Cromwell's interests terminated." *Id.* at 874.

We granted Cromwell's petition for review.

## II

Before turning to the merits, we first address Anadarko's argument that Cromwell forfeited the passive-voice argument he urges in this Court.[5] Anadarko's production maintained Cromwell's leases, his argument goes, because the Ferrer Lease and the Tantalo Lease used the passive voice in their respective habendum clauses. According to

---

[5] The parties speak of waiver rather than forfeiture. But, "[i]n truth, '[w]aiver may actually be the wrong term; it may be more accurate to call this forfeiture.' " *Bertucci v. Watkins*, 709 S.W.3d 534, 541 n.5 (Tex. 2025) (quoting *Roccaforte v. Jefferson County*, 341 S.W.3d 919, 929 n.20 (Tex. 2011) (Willett, J., concurring in part)); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted).

Anadarko, though, Cromwell did not adequately argue to the court of appeals that it should overrule its decision in *Cimarex*. We disagree.

"The statement of an issue or point will be treated as covering every subsidiary question that is fairly included." TEX. R. APP. P. 38.1(f); *see also Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam). On appeal, parties may construct new arguments for issues raised below. *Li v. Pemberton Park Cmty. Ass'n*, 631 S.W.3d 701, 704 (Tex. 2021) (per curiam).

Cromwell sufficiently presented the issue of the leases' automatic termination to the court of appeals. While he may not have expressly argued that the court of appeals should overrule its decision in *Cimarex*, he argued that his leases should not automatically terminate on unwritten conditions—the opposite of *Cimarex*'s holding. *See Cimarex*, 574 S.W.3d at 93 (holding that an oil-and-gas lease terminated because the lessee did not personally cause production, despite that requirement appearing nowhere in the lease). And Anadarko itself acknowledged in its brief below that Cromwell took a position "directly contrary to *Cimarex*." Further, Cromwell did not forfeit his argument that *Cimarex* should be overruled by arguing in the alternative that his leases did not terminate even if *Cimarex* applied. We therefore hold that Cromwell preserved his passive-voice argument.

## III

An oil-and-gas lease is just another type of contract, so general contract-interpretation principles govern our analysis. *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147–48 (Tex. 2020). As such, "we review lease-construction questions *de novo*."

8

*Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). We begin with the lease's text and seek to ascertain the parties' intent as expressed in the plain language of the written agreement that won their mutual assent. "A court's task 'is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.'" *Energen*, 615 S.W.3d at 148 (quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018)). No evidence of surrounding circumstances can justify interpreting the lease to "say what it unambiguously does not say." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017).

At issue here is the interpretation of two different passive-voice habendum clauses found in a pair of oil-and-gas leases. "A lease's habendum clause defines the mineral estate's duration." *Anadarko*, 94 S.W.3d at 554. A typical habendum clause divides the mineral estate's duration into two terms: the primary term and the secondary term. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 597 (Tex. 2018). The primary term usually maintains the lease for a fixed number of years. After the primary term expires, the secondary term continues the lease indefinitely, for as long as its conditions are satisfied. Cromwell's leases contain passive-voice habendum clauses. The Ferrer Lease continues into the secondary term "as long thereafter as oil, gas or other minerals are produced from said land." And the Tantalo Lease continues into the secondary term "as long thereafter as oil, gas, liquid hydrocarbons or their constituent products, or any of them, is produced in commercial paying quantities from the lands leased hereby." Put differently, both leases automatically terminate if at the

9

end of the primary term, or at any time during the secondary term, minerals are not being produced from the land.

In this case, Anadarko produced minerals from the land at all relevant times. Nobody disputes that. But Anadarko argues that Cromwell's leases terminated at the end of their primary terms because Cromwell did not personally cause production on the land. We reject that argument. The plain language of the habendum clauses does not specify who must produce to continue the leases. The habendum clauses could have said that the leases continue "as long as oil or gas is produced *by the lessee*"—as habendum clauses often do.[6] But the habendum clauses in the Ferrer Lease and the Tantalo Lease do not specify which party must do the producing, and we won't write in such a term ourselves. *See, e.g., Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, ___ S.W.3d ___, 2025 WL ___ (Tex. May 23, 2025) (holding that courts must not "blue-pencil" words into the parties' agreement); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (holding that courts must not "rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained").

---

[6] *See, e.g., Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 147–48 (Tex. 2004) ("as long thereafter as oil or gas, or either of them is produced from said land by the lessee, or as long as operations are being carried on"); *Fleming v. Ashcroft*, 175 S.W.2d 401, 403 (Tex. 1943) ("as long thereafter as oil or gas . . . is produced from said land by the lessee"); *W.T. Waggoner Est. v. Sigler Oil Co.*, 19 S.W.2d 27, 28 (Tex. 1929) ("as long thereafter as oil or gas or either of them was produced from the land by the lessee"); *Willson v. Superior Oil Co.*, 274 S.W.2d 947, 949 (Tex. Civ. App.—Texarkana 1954, writ ref'd n.r.e.) ("as long thereafter as oil or gas, or either of them, is produced from said land by the Lessee").

Because the leases do not require Cromwell to personally produce, and because the parties agree that production in commercial paying quantities has continuously occurred on the land, Cromwell's leases did not terminate. "We resolve the question of when a lease terminates by ascertaining the parties' intent from the lease as a whole." *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017). Cromwell and his lessors expressed their intent that the leases would remain in effect so long as minerals are produced from the land. This language "clearly indicates the intention of the parties that the lessee's estate is to terminate automatically at the end of the fixed term if oil or gas is not then being produced, or if the premises at any time thereafter should cease to produce oil or gas." A. W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 TEX. L. REV. 483, 512 (1930). Production has not ceased, so the leases have not terminated.

In holding otherwise, the court of appeals found the leases' stated purpose of exploring and drilling to be "indicative of the parties' intent to require" Cromwell to produce. 676 S.W.3d at 872. Courts are not authorized "to ensure that every provision [in a contract] comports with some grander theme or purpose, particularly when the parties have not said in the contract which purpose matters most or that everything else in the contract should be read subject to that purpose." *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023) (per curiam). The habendum clauses contain the key language that determines the duration of the mineral estates. By unduly focusing on

11

the leases' purposes, the court of appeals ran afoul of the habendum clauses' plain language.

While the habendum clauses' plain language did not require Cromwell to produce, Paragraph 16 of the Tantalo Lease adds a wrinkle. It provides:

> Subject to Paragraphs 6 and 11 above, rights granted under this lease shall be extended beyond the primary term provided herein, if, and only if, (a), *Lessee has obtained production* in commercial paying quantities prior to the expiration of said primary term, or (b), if *Lessee is then engaged in exploration operations* on the leased premises at the end of the primary term in which case Lessee, his successors and assigns, may complete any such well, or (c), if *Lessee has completed a well as a producer* or as a dry hole within sixty (60) days prior to the expiration of the primary term.

(Emphases added.)  Anadarko argues that Paragraph 16 requires Cromwell himself to cause production.  While Paragraph 16 purports to impose some obligations on the lessee, Paragraph 16 is by its own terms "[s]ubject to Paragraphs 6 and 11"—both of which contain still more passive-voice language and fail to specify who must undertake the various actions.  Further obscuring things, while Paragraph 16 is "[s]ubject to Paragraph[ ] . . . 11," Paragraph 11 is likewise "[s]ubject to Paragraph . . . 16."  Because Paragraph 16 is ambiguous, the default rule against forfeiture controls. *See Energen*, 615 S.W.3d at 149 (holding that if ambiguity remains after an attempt to interpret a lease based on its plain language, courts may rely on default rules of construction).

We disfavor forfeiture of mineral interests.  Accordingly, "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can

12

reasonably give it no other meaning." *Anadarko*, 94 S.W.3d at 554 (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)). A special limitation in an oil-and-gas lease is a term that "provides that the lease will automatically terminate upon the happening of a stipulated event." *Discovery Operating*, 554 S.W.3d at 606. The habendum clauses here impose a special limitation because the leases automatically terminate if the clauses' conditions are not satisfied—that is, if oil and gas are no longer produced on the land. Neither habendum clause "clear[ly], precise[ly], and unequivocal[ly]" requires Cromwell to produce, so we will not imply such a requirement to cause a forfeiture of his interests. *Anadarko*, 94 S.W.3d at 554. And because Paragraph 16 of the Tantalo Lease is ambiguous in imposing obligations on Cromwell, we decline to resolve the ambiguity in a way that forfeits his interest. We construe Paragraph 16 as a covenant that, if breached, may entitle the lessor to damages or a conditional decree of cancellation—but not automatic termination. As we have held, all "doubts should be resolved" against finding a condition that results in termination. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

Nor does our holding leave Anadarko without a remedy. Cromwell and Anadarko are co-tenants, both owning shares of the working interest on the same land. A non-producing co-tenant must account to the producing co-tenant for the reasonable and necessary costs of producing and marketing the minerals. *See Cox v. Davison*, 397 S.W.2d 200, 201 (Tex. 1965). If Cromwell were to refuse to pay his share of the operating expenses (which didn't happen), Anadarko could sue Cromwell for an accounting. Tenancy law already provides Anadarko a

13

remedy if Cromwell fails to fulfill his obligations as a co-tenant; it need not (and, here, cannot) seek termination of Cromwell's leases.

The court of appeals relied on a string of cases holding that passive-voice habendum clauses require the lessee to personally produce. This line of cases originated from the Fifth Circuit's decision in *Mattison v. Trotti*, 262 F.2d 339 (5th Cir. 1959). Making an *Erie* guess about Texas law, the Fifth Circuit held that a passive-voice habendum clause necessarily required drilling operations by the lessee because "the drilling for and the production of oil or gas by the lessee is the [lease's] prime consideration." *Id.* at 341.

In 1976, the El Paso Court of Appeals relied on *Mattison* in holding that a lease terminated because the passive-voice habendum clause required the lessee to perform directly or constructively to keep the lease alive. *Hughes v. Cantwell*, 540 S.W.2d 742, 743–44 (Tex. Civ. App.—El Paso 1976, writ ref'd n.r.e.). There, the operating co-tenant offered the non-operating co-tenant a chance to join in its production, but the non-operator declined. *Id.* at 743. The non-operating co-tenant therefore could not rely on his operating co-tenant's production to maintain his lease. The court relied on the lease's purpose—the drilling and producing of oil and gas—and on the fact that the land was leased exclusively to the lessee to accomplish that purpose. *Id.* at 744.

The El Paso Court of Appeals took it a step further in *Cimarex* by holding that even when the operating co-tenant prevents the non-operator from participating in its production, the non-operating co-tenant must personally produce to maintain its lease. 574 S.W.3d at 93, 95–96. *Cimarex*'s facts are like those here: The habendum clause

14

extended the lease for "as long thereafter as oil or gas is produced from said land," the non-operating co-tenant paid operating expenses, and the operator refused the non-operator's attempt to enter a joint operating agreement. *Id.* at 81–85. Relying on the lease's purpose and on other clauses, the court held that the non-operator's lease terminated because it did not personally produce. *Id.* at 91–92.

Because we hold that a passive-voice habendum clause does not automatically require production by the lessee, we disapprove of *Mattison,* 262 F.2d 339, *Hughes,* 540 S.W.2d 742, and *Cimarex,* 574 S.W.3d 73, to the extent they hold otherwise. Each departs from the plain language of the lease and instead "make[s] the language say what it unambiguously does not say." *Brumitt,* 519 S.W.3d at 110. Further, their rationale rests on a shaky foundation. The Fifth Circuit in *Mattison,* which begat *Hughes* and *Cimarex,* incorrectly premised its holding on the notion that the lease's prime consideration was drilling for and production of minerals. *Mattison,* 262 F.2d at 341. Not quite. Rather, the "vital consideration" in an oil-and-gas lease is "royalties on mineral production." *Texas Co. v. Davis,* 254 S.W. 304, 306 (Tex. 1923).

We hold that the plain language of these two habendum clauses did not require Cromwell to personally produce to maintain his interest. The parties and amici suggest actions a lessee could take to produce: signing a joint operating agreement, participating in an authorization for expenditure, paying operating expenses, drilling a well, pooling his interest, assigning his interest to a third party who drills a well, &c. We need not determine what other actions Cromwell could take to maintain his leases. He's already done enough. Because it is undisputed that

15

production in commercial paying quantities has always occurred on the land, Cromwell's leases did not terminate.

<p style="text-align:center">*　　*　　*</p>

We remain faithful to the text of oil-and-gas leases because doing so provides "legal certainty and predictability," values which "are nowhere more vital than in matters of property ownership, an area of law that requires bright lines and sharp corners." *Cosgrove v. Cade*, 468 S.W.3d 32, 40 (Tex. 2015). The judgment of the court of appeals is reversed, and the cause is remanded to the trial court to address the parties' remaining arguments.

<div style="margin-left:50%">

_____

James P. Sullivan
Justice

</div>

**OPINION DELIVERED:** May 23, 2025