Opinion filed October 23, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00107-CV

_____

**EVANS RESOURCES, L.P.; EVANS I, LTD.; EVANS I DEVELOPMENT, LTD.; MICHAEL SCOTT EVANS AND ROSE ELAINE EVANS SHOCK, AS INDEPENDENT CO-EXECUTOR AND CO-EXECUTRIX OF THE ESTATE OF GLORIA A. EVANS, DECEASED; JONATHAN J. EVANS; AND MOCKINGBIRD OIL & GAS L.P., Appellants**

**V.**

**DIAMONDBACK E&P, LLC AND DIAMONDBACK O&G, LLC, Appellees**

On Appeal from the 238th District Court

Midland County, Texas

Trial Court Cause No. CV51984

**O P I N I O N**

This litigation concerns an unfulfilled alleged oral promise by an operator to drill and pay for horizontal wellsite locations on the landowners' surface estate, which has evolved into a continuing dispute[1] over the construction and performance of the parties' oil and gas agreements. Appellants, which we refer to collectively as "the Evans entities,"[2] filed suit against Appellees Diamondback E&P, LLC and Diamondback O&G, LLC (collectively "Diamondback") for fraud, accounting of profits for cotenant wells, royalty underpayment, breaches of the parties' agreements, and declaratory relief. The trial court granted Diamondback's motions for partial summary judgment on several of the Evans entities' claims. The case proceeded to a jury trial on the Evans entities' remaining claims—royalty underpayment and cotenant accounting. The jury found that (1) Diamondback did not fail to pay royalties in accordance with the lease agreement, and (2) although Diamondback failed to account to the Evans entities as mineral cotenants, the Evans entities suffered no damages as a result.

We review the Evans entities' seven issues in a different order than briefed and we treat them as eight issues for the purposes of reducing repetition and enhancing opinion clarity. The Evans entities argue that:

A. The trial court erred in granting summary judgment in favor of Diamondback on the following claims:

> (1) fraud,
>
> (2) breach of the surface agreement, and
>
> (3) declaratory relief that an option in the surface agreement violates the rule against perpetuities.

---

[1]*See Evans Res., L.P. v. Diamondback E&P, LLC*, No. 11-18-00128-CV, 2020 WL 2838529 (Tex. App.—Eastland May 29, 2020, pet. denied) (mem. op.).

[2]Gloria A. Evans was a named plaintiff at the inception of the litigation, but she passed away before a final judgment was entered. *See id.* at *1 n.2.

B. The trial court abused its discretion or erred by:

(4) "dismissing" their claim for breach of the lease based on Diamondback's failure to obtain consent to pool;

(5) denying the Evans entities' motion for mistrial, and

(6) excluding evidence not timely disclosed in discovery.

C. The evidence is legally and factually insufficient to support the jury's findings that:

(7) Diamondback did not underpay royalties, and

(8) the Evans entities suffered no damages for Diamondback's failure to account for profits from co-tenant wells.

We affirm the trial court's judgment.

## I. *Factual and Procedural History*

The property at issue is a 651-acre section in Midland County[3] (Section 8) and is governed by three oil and gas production agreements between differing sets of the Evans entities and Diamondback:

(a) the oil and gas lease (the lease) between Evans Resources and Diamondback;

(b) the surface use agreement (the surface agreement) between Evans I, Ltd., Evans I Development, Ltd., Gloria Evans, Jonathan Evans (Evans surface owners) and Diamondback; and

(c) the net profits interest agreement (the NPI agreement) between Mockingbird and Diamondback.

---

[3]Section 8, Block X, T-1-S, H.P. Hilliard Survey.

A. *Bluestem and the Three Agreements*

The Evans entities initially executed a lease and other agreements with Bluestem Energy, LP (Bluestem). The lease is a "paid up"[4] oil and gas lease that grants the lessee the right to develop the minerals for the primary term of three years "and as long thereafter as oil and/or gas is produced in paying quantities from said land." It reserves to the Evans entities a 1/4 royalty interest and permits pooling with other sections upon the consent of Evans Resources. The surface agreement outlines the portion of land Bluestem would use to develop minerals. It provides for compensation to the Evans surface owners for Bluestem's development and use of the surface and requires that Bluestem fully accommodate the Evans surface owners' uses of the surface. Through the NPI agreement, Mockingbird receives a share of monthly profits from "oil or gas well[s] drilled . . . from a surface location on Section 8."

The agreements were amended at various times. On May 16, 2014, Evans Resources and Bluestem signed an amendment of the lease to allow Bluestem to pool and combine Section 8 with other property "for the drilling and producing of extended length horizontal wells." That same day, Bluestem and the Evans surface owners signed a third amendment to the surface agreement[5] in which the Evans surface owners granted Bluestem the right to drill and produce wells from four Approved Horizontal Well Pads (AHWP) on the land. Bluestem and the Evans surface owners acknowledged that they had agreed to the "general location" of the

---

[4]"A 'paid-up' lease is one under which all delay rentals bargained for are paid in advance, and this single payment maintains the lease during the primary term." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018).

[5]The first two amendments to the surface agreement related to the extension of the date by which Bluestem was required to bury pipelines and electrical lines on Section 8 and to the construction of a road on Section 8 and are not relevant to this appeal.

4

four AHWPs "to be constructed on the Land" and would agree on the "exact configuration" of each six-acre AHWP on or before May 16, 2015. The NPI was reduced from ten percent to seven and one-half percent for Offset Section Wells on the AHWPs.

B. *Assignment to Diamondback*

After the amendments, Bluestem requested that the Evans entities consent to the assignment of the agreements to Diamondback. A series of discussions followed, in which the Evans entities sought and alleged to have received assurances that Diamondback would drill the AHWPs. On August 21, 2014, Jonathan Evans consented on behalf of the Evans entities to the assignment of rights under the agreements to Diamondback.

After the assignment, Diamondback sought drilling permits from the Texas Railroad Commission to drill horizontal wells on Section 8. Diamondback agreed with the Evans entities regarding the location and configuration of the AHWPs. Diamondback attempted to reach agreements with the Evans entities regarding water, roads, and frac pits on Section 8 so that Diamondback could acquire drilling permits. Diamondback did not build pads or drill horizontally from any AHWPs for the first year, instead, it drilled three vertical wells to keep the lease active. Diamondback ultimately drilled horizontal wells from a tract north of Section 8; with the wellbores running horizontally through Section 8. Diamondback sent Evans Resources notices that it pooled Section 8 with neighboring property starting in December 2015.

C. *Previously Severed Claims*

Evans Resources and the Evans surface owners filed their first original petition against Diamondback in January 2016, requesting a declaration that location damages for each AHWP were due and owing, and asserting claims for breach of contract based on Diamondback's refusal to pay AHWP location damages, as well

5

as refusing to agree to requests for variances. Their fourth amended petition also alleged breach of contract due to Diamondback's refusal to grant a reasonable reduction in the setback around each well, and a failure to downsize other vertical well pads once drilled. They further requested judicial foreclosure of a contractual lien on Diamondback's interest in the leased property.

Diamondback moved for partial summary judgment on the Evans' entities claim for breach of contract based on its failure to pay the AHWP location damages. It argued that it did not owe damages for well pads that had not been constructed. The trial court granted Diamondback's motion and severed that claim from the lawsuit. The Evans entities appealed the trial court's order, and we affirmed. *See Evans Res., L.P.*, 2020 WL 2838529, at *8.

D. *Pretrial*

In the trial court, the Evans entities added and expanded claims against Diamondback through five amended petitions. Mockingbird was added as a plaintiff in their fourth amended petition on January 13, 2023. In the Evans entities' live pleading, they asserted, in pertinent part, claims for (1) fraud; (2) breach of the lease based on the failure to provide recordable releases, the creation of pooled units without consent, the failure to pay royalties, the failure to pay interest owed under the lease, and the miscalculation of royalties paid; (3) bad faith pooling; (4) an accounting of profits and payment for cotenant wells; (5) breach of the surface agreement; and (6) declaratory judgment seeking a declaration that Diamondback's claimed "perpetual option" to use the four AHWPs on Section 8 violates the rule against perpetuities.

The trial court granted multiple pretrial motions filed by Diamondback. In particular, the trial court granted Diamondback's motions to exclude expert testimony regarding damages for breach of the surface agreement and granted its motions for partial summary judgment on the following claims:

1. breach of the surface agreement;

2. the NPI claims of Evans surface owners and Evans Resources because they were not third-party beneficiaries to the NPI agreement;

3. Mockingbird's fraud claim because it was time-barred;

4. the declaratory judgment claim that parts of the third amendment to the surface agreement violated the rule against perpetuities; and

5. the declaratory judgment claim regarding failure of consideration and equitable estoppel.[6]

The trial court initially denied Diamondback's motion for partial summary judgment on the Evans entities' fraud claim.

Diamondback filed a traditional motion for summary judgment and a motion under Rule 166 of the Texas Rules of Civil Procedure seeking a pretrial determination on the Evans entities' "'fraud' claims," arguing that they could not establish justifiable reliance or a change of position, NPI damages were barred by the statute of frauds, and a constructive trust was unavailable to the Evans entities. *See* TEX. R. CIV. P. 166 (Pre-trial Conference). The trial court initially denied Diamondback's traditional motion for summary judgment, and the Evans entities' claims for fraud, royalty underpayment, pooling without consent, bad faith pooling, and cotenant accounting all remained for trial.

E. *Evidentiary and Dispositive Rulings at Trial*

At trial, the trial court granted Diamondback's motion to exclude the testimony of Tim Smith, the Evans entities' expert witness, on NPI damages resulting from Diamondback's failure to build the AHWPs. The trial court further ruled that evidence of the Evans entities' claims regarding Diamondback's alleged failure to obtain consent to pooling due to the failure to timely disclose in discovery

---

[6]Evans entities do not appeal this ruling, nor do they pursue an appeal on their claim for bad faith pooling.

the damages claimed therefrom and the Evans entities' abandonment of those claims in open court would not be admitted. The trial court also revisited and granted Diamondback's motion for partial summary judgment on the Evans entities' fraud claim and rendered a take-nothing judgment on that claim. The Evans entities moved for a mistrial, arguing that the mid-trial disposition of that claim created undue prejudice due to the time the Evans entities spent addressing their fraud claim before the jury. The trial court denied the motion. As a result, only the Evans entities' claims for underpayment of royalties and for an accounting remained.

The trial court also granted Diamondback's motion to exclude the following evidence due to non-disclosure or late disclosure during pretrial discovery: late-payment interest on royalties; damages for pooling; attorney's fees; and a portion of claimed damages for royalty underpayments and lack of cotenant well profit accounting on acreage for which the lease had expired but that Diamondback continued to explore and produce.

F. *Trial Testimony*

Lori Evans Lucas and Jonathan Evans testified generally about the family's businesses negotiations with Bluestem and later Diamondback. Each testified that Diamondback made representations that it would drill horizontally from AHWPs to be built as contemplated by the agreements and that Diamondback failed to do so. Elizabeth Moses, a former Diamondback employee, testified by deposition about efforts to reach a firm agreement with the Evans entities concerning the surface estate providing the necessary water for proposed horizontal wells at the AHWP locations.

The Evans entities presented Tim Smith as an expert witness to testify regarding his opinion on damages resulting from Diamondback's failure to account for profits from cotenant wells. Smith testified that Diamondback drilled twenty-nine horizontal wells just north of Section 8. The lateral section of the wells ran

13,000 feet in length that traveled under Section 8, under another section to the south, and under half of a section further south. Smith stated that at some depths and areas of Section 8, the lease had terminated by its terms such that Evans Resources then became a cotenant and thus entitled to all the revenue less expenses. Smith opined that in areas where Evans Resources was treated as having a royalty interest rather than being a cotenant, it was underpaid $337,000. Paul Evans, a limited partner in Evans Resources, then testified that Diamondback had breached the lease on multiple occasions by paying royalties late—after they were past due.

Charles Graham, the Evans entities' expert witness concerning royalty payments, testified that the royalties paid had been miscalculated because the minerals' market value was calculated at the wrong location under the lease, which "should have been based on the market value of crude oil on the Texas Gulf Coast." Graham calculated an underpayment of $229,508.49 in crude oil royalties. Also, with regard to the natural gas produced, Graham stated that a deduction of either thirteen or ten percent should have been added to the proceeds, resulting in an underpayment by Diamondback of $103,897.13 in royalties. Graham acknowledged that Diamondback has paid the Evans entities over $20.5 million in royalties.

Diamondback presented Angela Paslay as an expert witness on royalty payments. She opined that Diamondback did not underpay royalties, but that the Evans entities had "been paid in accordance with the lease and in excess of its ownership in the actual proceeds of the sales." She stated that overpayment to the Evans entities had occurred because Diamondback should only have paid royalties based on crude oil market prices then existing for Midland County, but it had actually paid the Evans entities based on higher gulf coast market pricing.

G. *Jury Verdict and Final Judgment*

The jury answered "[n]o" to Question No. 1 that asked whether Diamondback "fail[ed] to pay royalties in accordance with the terms of Section 4 of the Evans

9

Lease." The jury answered "[y]es" to Question No. 3 asking whether Diamondback had "fail[ed] to account to Evans Resources as a mineral cotenant." However, in answering Question No. 4, "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Evans Resources for Diamondback's failure to account[,]" the jury answered "$0." The trial court entered a final take-nothing judgment. The Evans entities filed a motion for new trial, which the trial court denied. This appeal followed.

## II. *Summary Judgment and Evidence Exclusion*

In four issues, the Evans entities challenge the trial court's summary disposition of certain claims.

### A. *Standard of Review*

We review the trial court's grant of summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). Generally, if a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

After an adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.* Evidence is no more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion"

10

of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to a traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).

"A trial court's decision to consider evidence—or not—on summary judgment is reviewed for an abuse of discretion." *State v. Three Thousand, Seven Hundred Seventy-Four Dollars & Twenty-Eight Cents U.S. Currency*, 713 S.W.3d 381, 387 (Tex. 2025) (citing *Lujan*, 555 S.W.3d at 84–85). "An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling. *Id.*; *see* TEX. R. APP. P. 44.1.

Rule 166(g) of the Texas Rules of Civil Procedure permits the trial court to identify "legal matters to be ruled on or decided by the court" at a pretrial conference. TEX. R. CIV. P. 166(g). "When a Rule 166(g) order disposes of claims in this fashion, the order is akin to a summary judgment or directed verdict, and review is de novo."

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

"A party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried." TEX. R. CIV. P. 165. "Whether a pleading has been abandoned is a question of law which we review de novo." *In re C.C.J.*, 244 S.W.3d 911, 921 (Tex. App.—Dallas 2008, no pet.) (citing *In re Shaw*, 966 S.W.2d 174, 177 (Tex. App.—El Paso 1998, no pet.)).

### B. *Fraud: No Justifiable Reliance upon Oral Representations Contrary to Written Contract Terms*

In their first issue, the Evans entities argue that the trial court erred in granting summary judgment on their fraud claim. The elements of fraud are: (1) a material representation that was false; (2) knowledge the representation was false, or the representation was made recklessly as a positive assertion without any knowledge of its truth; (3) intent to induce the plaintiff to act upon the representation; and (4) actual and justifiable reliance upon the representation and resulting injury. *Orca Assets*, 546 S.W.3d at 653 (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). "The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *Id.* (citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)).

We only address the justifiable reliance element because it is dispositive. The Evans entities' fraud claim is premised on Diamondback's oral representations that it would drill horizontal wells if the Evans entities agreed to assign Bluestem's interest in the agreements to Diamondback. Diamondback moved for summary judgment on the basis that the Evans entities could not have justifiably relied on Diamondback's promises that it would drill horizontal wells because the parties'

agreements contradict those promises. The Evans entities argue that the agreements do not contradict such a promise.

In *Roxo Energy Co., LLC v. Baxsto, LLC*, 713 S.W.3d 404 (Tex. 2025), the Texas Supreme Court recently discussed the justifiable reliance element in a similar context. In *Roxo*, the court "consider[ed] the viability of claims based on alleged oral representations that are inconsistent with the parties' written contracts." *Id.* at 407. Roxo, a potential mineral leasehold owner, made representations to Baxsto that Roxo "would not 'flip' the lease but would instead make significant investments to develop it." *Id.* at 408. The parties later entered into various agreements, including an oil and gas lease. *Id.* at 407–08. Roxo did not drill a well on Baxsto's acreage, and Baxsto later sold the acquired minerals to another operator. *Id.* at 408. Baxsto sued Roxo for fraud, claiming that its representations during negotiations were false "and made with the intent to induce Baxsto to 'lock itself into' an unproductive lease and then later sell its mineral interests at a price lower than true market value." *Id.* The trial court granted summary judgment for Roxo on Baxsto's fraud claims. *Id.*

The Texas Supreme Court stated that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.* at 409 (quoting *Orca Assets*, 546 S.W.3d at 658). The court explained that, "Baxsto seeks to bind Roxo to its oral promise to drill on and develop the lease. Roxo points out, however, that the lease Baxsto signed contains no obligation to drill or develop the land." *Id.* The court noted that "the lease contains a typical assignment provision, which allows 'the interest of either Lessor or Lessee hereunder to be assigned, devised, or otherwise transferred in whole or in part.'" *Id.* It continued, "[e]ven if Roxo told Baxsto it would drill rather than 'flip' the lease, both parties later signed an agreement giving Roxo an unqualified right to transfer the lease rather than drill." *Id.* The court concluded that "[t]his unqualified transfer right, clearly expressed in

writing and agreed to by Baxsto, directly contradicts the notion that Roxo bound itself orally not to transfer the lease and instead to drill." *Id.* Thus, the court held that "[a]ll of Baxsto's claims premised on Roxo's alleged promises to develop the acreage rather than 'flip' it fail for lack of justifiable reliance." *Id.* at 410.

*Roxo* is controlling in the instant case. The Evans entities alleged that Diamondback made representations that it would timely drill horizontal wells on Section 8 should the Evans entities agree to the assignment of Bluestem's interest in the subject agreements. Yet, those agreements do not require drilling but only contemplate its possibility. The lease states that beyond the initial drilling obligations, "[a]dditional wells and their locations will be at the discretion of the Lessee." The parties could have negotiated a requirement for the drilling of horizontal wells, and corresponding timeline, but instead left the agreement as-is. Accordingly, any reliance on such representations was not justified as a matter of law. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496–501 (Tex. 2019) (fraud claims lacked merit because, in light of written agreement that consent was needed to assign lease, plaintiff could not have plausibly believed oral promise that consent would not be withheld); *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558–59 (Tex. 2019) (fraudulent-inducement claim lacked merit because, in light of written agreement that franchise was nonexclusive and required consent to relocate, plaintiff could not have plausibly believed oral promise that franchise was exclusive and could be relocated without consent); *Orca Assets*, 546 S.W.3d at 658–60 (fraud claims lacked merit because, in light of written agreement that lessor did not warrant title, plaintiff could not have plausibly believed oral promise that property had clear title).

Because the Evans entities could not justifiably rely on Diamondback's alleged oral representations that it would drill horizontal wells on Section 8, Diamondback conclusively negated an essential element of the Evans entities' fraud

14

claim; therefore, the trial court did not err in granting summary judgment on such claim. *See Raynor v. Moores Mach. Shop, LLC*, 359 S.W.3d 905, 907 (Tex. App.— Houston [14th Dist.] 2012, no pet.). The first issue as decided being determinative, we need not address the Evans entities' further argument challenging the disposition of their fraud claim. *See* TEX. R. APP. P. 47.1. We overrule the Evans entities' first issue.

C. *Breach of the Surface Agreement*

In their second issue, the Evans entities argue that the trial court erred when it excluded portions of the affidavits of Jonathan Evans and their experts made in response to Diamondback's no-evidence summary judgment motion on the claim of a breach of the surface agreement by Diamondback. The Evans entities claimed that Diamondback breached the surface agreement by failing to downsize vertical well pads after drilling was completed and by failing to consent to their proposed zoning variance requests to be made to the Midland City Council for reduction in the setback around each well. Diamondback moved the trial court to exclude the opinions of two of the Evans entities' experts on the zoning variance claims and the late disclosed affidavit of Jonathan Evans. Diamondback then followed up by filing a corresponding no-evidence motion for summary judgment.[7]

1. *Exclusion of Expert Testimony*

a. *Pertinent Facts*

John M. Newton and Victor R. Probandt each authored expert reports regarding the zoning variance claim. Both experts' opinions were based on a provision of the City of Midland Municipal Code which provides in relevant part:

> An owner of private residences or commercial structures may request a variance from the City Council in order to receive a building permit for the construction of a residence or building within 500 feet of any

---

[7]The Evans entities did not designate an expert witness regarding damages for Diamondback's failure to downsize well pads.

previously permitted oil and gas well. Any application for such a variance must be accompanied by a notarized petition signed by the owners of the residence or commercial structure that seeks to obtain a building permit within 500 feet of the previously permitted oil and gas well. In the event a variance is granted by the City Council, the Council may authorize the building official to issue a building permit to the applicant.

. . . .

In no event shall a building permit be issued by the City of Midland for any private residence or commercial building to be constructed, either in whole or in part, within 300 feet of a previously permitted but undrilled oil and gas well or 135 feet of an existing oil and gas well or within 150 feet of a previously permitted tank battery.

. . . .

A request for a variance under this Subsection shall not require a public hearing held before the City Council. In order to grant the variance, the council must determine that the granting of the permit would not present a health or safety risk to the applicant or subsequent occupants of the structure.

An owner of property may request the setback variance at any time, including at the time of platting; provided, however, any plat approved permitting the construction of a private residence or commercial structure within such proximity to an existing well shall contain a notation on the face of the plat reflecting the approval of the setback variance.

The Council shall vote on the variance at a regular meeting. A majority vote of the Council is required to pass a resolution authorizing a variance under this Subsection.

Midland, Tex., Code of Ordinances ch. 6-1, § 6-1-23(H)(2)(c) (2009), https://ecode360.com/41100617#41101041 (last visited October 19, 2025). Interpreting this code provision, Newton stated, "I believe that a variance up to 135' of an existing well would be granted if Diamondback consented to the development." Probandt opined that "the market value of the diminution in value to

the subject property, due to differences between a 500' setback requirement and a 135' setback variance, as of December 13, 2022, was: [$6,670,000]."

Diamondback filed motions to exclude both experts, arguing that their opinions were irrelevant and unreliable because both experts improperly assumed that the variance requests would have been granted even though they were never applied for, objected to, or considered by the Midland City Council. The trial court granted the motions.

b. *Applicable Law & Evidentiary Standard of Review*

"Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). "Although expert opinion testimony often provides valuable evidence in a case, it is the basis of the witness's opinions, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Wagner v. Exxon Mobil Corp.*, 654 S.W.3d 613, 633 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (internal quotation marks omitted))). "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009) (citations omitted).

> Expert testimony is unreliable if there is too great an analytical gap between the data on which the expert relies and the opinion offered. Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion. Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary

17

materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached.

*Gharda*, 464 S.W.3d at 349 (cleaned up).

Courts must "rigorously examine the validity of facts and assumptions on which the [expert] testimony is based." *Camacho*, 298 S.W.3d at 637. If an expert's opinion is unreliable because it is "based on assumed facts that vary from the actual facts," the opinion "is not probative evidence." *Id.*; *see Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995) ("When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.").

"We review a trial court's rulings on the admissibility of evidence for an abuse of discretion, including rulings on the reliability of expert testimony." *Gharda*, 464 S.W.3d at 347 (first citing *Camacho*, 298 S.W.3d at 638; and then citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)).

c. *Analysis*

The Evans entities argue that both experts' opinions were supported by evidence that Diamondback issued a blanket denial to consent to a variance as well as Newton's statement that the Midland City Council routinely grants variances when the operator does not object. Diamondback responds that Newton's opinions are conclusory and amount to inadmissible speculation that had Diamondback agreed not to object to variances that the Evans entities had never requested, the Midland City Council would have approved the variances. Diamondback argues that Probandt's analysis assumed that hypothetical requests for variances would not have been denied "even though the variances . . . had not been (1) applied for; (2) objected to; or (3) considered by the Midland City Council."

In his deposition, Jonathan Evans testified that the only request for a variance submitted by the Evans entities was approved by the Midland City Council over

18

Diamondback's objection. There is no evidence in the record of any other variance request submitted to the city council by the Evans entities. The Evans entities did not apply for the thirteen additional variances forming the basis of Probandt's damage calculation because they assumed that Diamondback would oppose them. Although the Evans entities assumed Diamondback would oppose these variances, they never asked Diamondback to consent to these requests. The city ordinance cited above provides that the city council "must determine that the granting of the permit would not present a health or safety risk," and does not require operator approval as a prerequisite to granting the variances. Midland, Tex., Code of Ordinances ch. 6-1, § 6-1-23(H)(2)(c) (2009).

Both experts' opinions were based on assumed facts that are contradicted by facts in the record: (1) the City of Midland approved a variance request that Diamondback opposed and the operator's consent is not required by city ordinance; thus, Diamondback's consent was not a prerequisite for approval of the variances; (2) the Evans entities did not request additional variances; and (3) Diamondback did not specifically oppose these unrequested variances. Thus, the trial court did not abuse its discretion in concluding that the opinions were unreliable because they are "based on assumed facts that vary from the actual facts." *See Camacho*, 298 S.W.3d at 637.

### 2. *Exclusion of Jonathan Evans's Testimony*

#### a. *Pertinent Facts*

After the discovery deadline had passed, in response to Diamondback's motion for partial summary judgment, Jonathan Evans provided testimony by affidavit regarding damages allegedly resulting from Diamondback's refusal to agree to variances. Jonathan Evans stated that the Evans entities suffered damages in the range of $5,250,000 to $9,625,000 based on his opinion as to the market value of Section 8. Diamondback moved to strike these opinions because they were not

19

timely disclosed, causing unfair surprise to Diamondback, without good cause for the delayed disclosure. The Evans entities previously disclosed only that their damages would be the subject of expert testimony and they designated Probandt to address market value. Diamondback noted that Jonathan Evans testified in his deposition that he would need to refer to "someone else to help figure damages." The trial court granted Diamondback's motion to strike relevant portions of Jonathan Evans's affidavit regarding claimed damages.

b. *Applicable Law*

A trial court's decision on whether to admit testimony and evidence that is not timely disclosed is reviewed for an abuse of discretion. *See Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881–82 (Tex. 2009). "Without awaiting a discovery request, a party must provide to the other parties . . . the amount and any method of calculating economic damages." TEX. R. CIV. P. 194.2(b)(4). "A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified." *Id.* R. 193.6(a). This exclusionary rule applies unless the trial court finds that: (1) there was good cause for the failure to timely disclose the evidence; or (2) the party's failure to timely disclose the evidence will not unfairly surprise or unfairly prejudice the other parties. *Id.* The proponent of the evidence has the burden to establish good cause or the lack of unfair surprise or prejudice. *Id.* R. 193.6(b).

To determine if the untimely discovery would unfairly surprise or prejudice the other party, we consider the purpose of Rule 193.6. *See Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 672 (Tex. App.—Austin 2017, no pet.) (collecting cases). The purpose of Rule 193.6 is to: (1) promote responsible assessment of settlement, (2) prevent trial by ambush, and (3) give the

other party the opportunity to prepare rebuttal to expert testimony. *See In re D.W.G.K.*, 558 S.W.3d 671, 680 (Tex. App.—Texarkana 2018, pet. denied). Accordingly, to establish the absence of unfair surprise or unfair prejudice, the party seeking to offer the testimony of an untimely disclosed witness or to introduce untimely disclosed evidence must establish that the other party possessed enough evidence to reasonably assess settlement, to avoid trial by ambush, and to prepare rebuttal to expert testimony. *Id.*

c. *Analysis*

The Evans entities argue that they timely disclosed the amount and method of calculating their economic damages by designating Probandt and by providing his expert report on damages. They further argue that Jonathan Evans need not separately be disclosed as an expert witness under the property owner rule. The Evans entities also maintain that Jonathan Evans's damage opinions did not unfairly surprise Diamondback because the Evans entities timely disclosed that the failure to obtain variances prevented them from continuing to operate a winery and use Section 8 for residential lots and because Jonathan Evans's affidavit is "consistent" with Probandt's previously disclosed opinion.

The Evans entities are correct that a property owner need not be disclosed as an expert witness. *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 577 (Tex. App.—San Antonio 2017), *aff'd*, 593 S.W.3d 324 (Tex. 2020) (explaining that being subject to Rule 701, a property owner need not be disclosed or designated as an expert to testify about the value of his property). However, this rule only provides an exception to the requirement that a witness must establish his qualifications to express an opinion about the value of land. *Jatex Oil & Gas Expl. L.P. v. Nadel & Gussman Permian, L.L.C.*, 629 S.W.3d 397, 406 (Tex. App.—Eastland 2020, no pet.) (citing *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012)). Regardless of Jonathan Evans's

21

qualifications to testify regarding the value of land, the Evans entities were required to timely disclose the amount and method of calculating economic damages as expressed by Jonathan Evans. *See* TEX. R. CIV. P. 194.2(b)(4).

The Evans entities' disclosure of Probandt's damage calculation is not sufficient. We have concluded that Probandt's testimony was properly excluded for other reasons. Further, Jonathan Evans's calculations were entirely different from Probandt's, and he did not use the same methods as Probandt. Probandt assessed damages to be $6,670,000 based on his determination of the market value of the land using a sales comparison approach supported by a detailed discussion of his methods. Meanwhile, Jonathan Evans testified to damages ranging from $5,250,000 to $9,625,000 based on a market valuation derived from his personal knowledge and "other qualifications." Jonathan Evans did not discuss his method for arriving at his damages' calculation. Accordingly, the trial court did not abuse its discretion in determining that portions of Jonathan Evans's affidavit regarding damages should be excluded because the Evans entities had not previously disclosed the amount and method of calculating economic damages relied on by Jonathan Evans. *See Gillenwater*, 285 S.W.3d at 881–82.

Further, the Evans entities did not demonstrate the lack of unfair surprise or unfair prejudice. While they disclosed their theory of causation—the failure to obtain variances prevented them from continuing to operate a winery and use Section 8 for residential lots—Diamondback could not have anticipated that Jonathan Evans would testify regarding his opinion as to these damages allegedly sustained, nor as to Jonathan Evans's calculations of the amount of damages or his methods for doings so. The Evans entities previously disclosed that their damages would be the subject of expert testimony, but they designated Probandt to address market value. Importantly, Jonathan Evans testified in his deposition that he would need to refer to "someone else to help figure damages."

22

"[R]ule 193.6(a) relates to the discovery of *evidence*; its principal purpose—and most common application—is to protect a party from surprise concerning the existence of undisclosed evidence—not issues." *Oscar Luis Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 862 (Tex. App.—Dallas 2006, no pet.). "The rule applies when the existence of evidence was not disclosed in a timely manner, whether or not such evidence related to an issue both parties knew existed in the case." *Id.* Based on the foregoing, we conclude the trial court did not abuse its discretion in concluding that the Evans entities failed to establish lack of unfair surprise or unfair prejudice. *See Gillenwater*, 285 S.W.3d at 881–82.

### 3. *Summary Judgment Ruling*

We conclude, as the trial court did, that there is an absence of evidence regarding the existence and amount of causation damages on the Evans entities' claim for breach of the surface agreement. Thus, the trial court did not err in granting Diamondback's no-evidence motion for summary judgment on this claim. *See Timpte Industries, Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). We overrule the Evans entities' second issue.

### D. *Rule Against Perpetuities*

In their third issue, the Evans entities argue that the trial court erred in granting summary judgment against their claim that the option to drill horizontal well pads contained in the surface agreement violates the Rule Against Perpetuities.

### 1. *Applicable Law*

"Perpetuities . . . are contrary to the genius of a free government, and shall never be allowed." TEX. CONST. art. I, § 26. "The interpretative commentary states both that 'perpetuity' as applied to property means an 'everlasting property interest[]' and that '[f]or purposes of this section, a perpetuity is a restraint or restriction of the power of alienation beyond [the period required by the Rule], and as such would not be constitutionally allowed.'" *Koopmann*, 547 S.W.3d at 866–67

23

(quoting TEX. CONST. art. I, § 26 interp. commentary (Vernon 2007)). The Texas Supreme Court has "adopted the common law version of the Rule to govern conveyances of real property, which provides that 'no interest is valid unless it must *vest,* if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance.'" *Id.* at 867 (quoting *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017) (emphasis added)).

> The word 'vest' in regards to the Rule refers to an immediate, fixed right of present or future enjoyment of the interest. The Rule does not apply to present or future interests that vest at their creation. An executory interest is a future interest, held by a third person, that either cuts off another's interest or begins after the natural termination of a preceding estate. A springing executory interest is one that operates to end an interest left in the transferor. This interest does not vest at the execution of the deed, rather 'executory interests vest an estate in the holder of the interest upon the happening of a condition or event.' 'Until such happening, they are non-vested future interests' and are subject to the Rule.

*Id.* (internal citations omitted). In addition, the Texas Supreme Court has held that "the typical oil and gas lease in Texas, which grants a lessee the right to explore and develop for a fixed term of years and as long thereafter as minerals are produced, creates in the lessee a fee simple determinable in the mineral estate that does not violate the Rule." *Id.* (citing *Rosson v. Bennett*, 294 S.W. 660, 662 (Tex. App.— Waco 1927, no writ)).

2. *Analysis*

Here, the lease immediately grants to the lessee "the land . . . for the purposes and with the exclusive right of exploring, drilling and operating for, producing and owning oil and gas." This is not a perpetual right. The lease states that the term of the lease is "three (3) years from the effective date of this date (called 'Primary Term') and as long thereafter as oil and/or gas is produced in paying quantities from said land." Such a duration "does not violate the Rule." *See Koopmann*, 547 S.W.3d

24

at 867. The rights granted include a right to determine future well locations subject only to the Evans surface owners' consent—which cannot be unreasonably withheld. The Third Amendment to the Surface Agreement describes the location and size of four AHWPs and provides that if Lessee chooses to drill from the AHWPs, Lessee shall pay the Lessor $500,000 for each AHWP. This provision vests Diamondback with the immediate, fixed right to build and drill from the AHWP's. Because the Rule does not apply to interests that vest at their creation and the term of the lease does not violate the Rule, we conclude that the trial court did not err in granting Diamondback's motion for summary judgment on this claim. *See Valance Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We overrule the Evans entities' third issue.

E. *Nonconsent to Pooling Claims*

In their fourth issue, the Evans entities argue that the trial court erred in dismissing their claim for breach of the lease based on Diamondback's failure to obtain consent to pool because the Evans entities did not abandon these claims, and they adequately disclosed their damages.

1. *Pertinent Facts*

The Evans entities pleaded that Diamondback failed to obtain their consent to pool. The Evans entities' theory of damages was based on Diamondback's "commingling" of oil or "confusion of goods." The Evans entities did not provide in discovery a damages calculation related to the pooling claims, and the trial court ruled that they could not present damages for those claims at trial. At a pretrial conference, the Evans entities represented the following:

> [W]e are not seeking a separate amount that's attributable only to bad faith pooling. We . . . intend to argue that . . . the failure to get consent under the lease . . . [is] very much bound up with the facts of our fraud claim. . . . But we are not asking the jury to award a separate line item of damages based on those facts.

25

Moments later, the following exchange occurred:

> THE COURT: Okay. So there's no claim really for bad faith pooling because there's no damages as a separate cause of action; can we agree to that?
>
> [THE EVANS ENTITIES]: To put it in the context of the jury charge . . . , we don't intend to submit a liability question on, quote, bad faith pooling or a damages question on that.
>
> [THE EVANS ENTITIES]: [W]e're not pursuing commingling.
>
> . . . .
>
> THE COURT: So we're not going to get into the confusion of goods doctrine or any of that stuff?
>
> [THE EVANS ENTITIES]: Confusion of goods, no.
>
> [DIAMONDBACK]: Your Honor, I just heard them in the discussion of the live pleading abandon their commingling confusion of goods claim. . . . I think it's out.
>
> [THE EVANS ENTITIES]: We're not pursuing [it], Your Honor.

Two days later, the Evans entities' counsel stated that they would pursue bad faith pooling but provided no damages calculation.

### 2. *Abandonment*

The Evans entities contend that their informal statement, which was subsequently clarified, cannot be construed as an abandonment. As stated above, Rule 165 provides that "[a] party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried," and we review whether a pleading has been abandoned de novo. TEX. R. CIV. P. 165; *C.C.J.*, 244 S.W.3d at 921. A party need not formally amend its pleadings for abandonment to occur. *C.C.J.*, 244 S.W.3d at 921 (citing *Shaw*, 966 S.W.2d at 177). Pleadings may be abandoned by a stipulation, such as a concession made in a judicial proceeding by a party. *In re I.L.*, 580 S.W.3d

26

227, 245 (Tex. App.—San Antonio 2019, pet. dism'd).  In this regard, "[w]here a stipulation limits the issues to be tried or considered by the jury, those issues are excluded from consideration."  *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

The Evans entities' counsel clearly stated in open court that they were not submitting a damages question relating to their pooling claims, and that they only wished to discuss Diamondback's failure to obtain consent in connection with their pleaded fraud claim.  This representation constitutes a stipulation that limited the issues to be tried or considered by the jury.  *See id.*; *see also Pruitt v. Int'l Ass'n of Fire Fighters*, 366 S.W.3d 740, 747 (Tex. App.—Texarkana 2012, no pet.) (construing counsel's statement that he did not intend to move forward on a certain cause of action constituted abandonment of that claim).  We conclude that the trial court did not err to the extent it found that the Evans entities abandoned their pooling claim.  *See C.C.J.*, 244 S.W.3d at 921.  We need not address the Evans entities' failure to provide a calculation of damages in discovery or the Evans entities' remaining arguments on this issue because they are not otherwise dispositive.  *See* TEX. R. APP. P. 47.1.  We overrule the Evans entities' fourth issue.

### III.  *Denial of Mistrial*

In their fifth issue, the Evans entities argue that the trial court erred in denying their motion for mistrial following the trial court's mid-trial grant of partial summary judgment that disposed of their fraud claim.

#### A.  *Standard of Review and Applicable Law*

"We will not disturb a ruling denying a motion for mistrial absent a showing of an abuse of discretion."  *Bazan v. Munoz*, 444 S.W.3d 110, 123 (Tex. App.—San Antonio 2014, no pet.).  "A trial court abuses its discretion if it acts without reference to any guiding rules and principles such that the ruling is arbitrary or unreasonable."  *Pressley v. Casar*, 567 S.W.3d 327, 333 (Tex. 2019).  "Only in extreme

27

circumstances, where the prejudice is incurable, will a mistrial be required." *Givens v. Anderson Columbia Co., Inc.*, 608 S.W.3d 65, 71 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re E.O.E.*, 508 S.W.3d 613, 624 (Tex. App.—El Paso 2016, no pet.) (internal quotation marks omitted)).

B. *Analysis*

The Evans entities maintain that "[t]he trial court's midtrial reversal and exclusion of [their] fraud claim, and any related evidence, resulted in a denial of [their] right to a fair trial and led to the rendition of an improper judgment." The Evans entities do not cite to any authority for the proposition that a trial court's summary disposition of a claim during trial constitutes an abuse of discretion and in turn warrants a mistrial, and we have found none. To the contrary, by denying the motion for mistrial, the trial court could have implicitly concluded that the Evans entities were not unfairly prejudiced by its disposition of their fraud claim and therefore the severe sanction of a mistrial was not warranted. *See Mid Continent Lift & Equip.*, 537 S.W.3d at 671–72 (implicit conclusion by the trial court that negated burden of unfair surprise and unfair prejudice was not met; determination of whether burden was met is committed to the trial court's discretion); *Port of Houston Auth. of Harris Cnty. v. Zachry Const. Corp.*, 513 S.W.3d 543, 568–69 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (trial court did not abuse discretion, in breach-of-contract action, in excluding evidence of harms and losses; did not detail the $8.5 million of actual damages it sought).

The Evans entities' core complaint here is that the trial court changed one of its pretrial summary judgment rulings during trial. Before trial, Diamondback moved for summary judgment on the Evans entities' "'fraud' claims," which the trial court initially denied. Thus, and because this claim remained viable, it is reasonable to assume that the validity of their fraud claim, or any issue central to it, would be raised again, even multiple times, during trial. In pretrial hearings, objections to

causes of action and evidentiary offerings that are presented in the abstract may take on a different legal hue during trial. What was previously academic becomes more concrete once the trial court views the evidence and relevant causes of action in the context of the actual trial, thereby providing further meaning and clarity.

Here, regarding the Evans entities' fraud claim, we have concluded that, as a matter of law, there could be no reasonable reliance on an alleged oral promise that was contrary to the clear terms expressed within the parties mutually executed written lease. Because trial management is encompassed within the trial court's inherent discretion and authority, ruling correctly on a cause of action does not result in the denial of the right to a fair trial, rather it insures it—for both parties. The trial court does not err in doing so, rather, it prevents error and an improper judgment on that basis. In summarily disposing of the fraud claim mid-trial as it did, the trial court could also have determined that any prejudice to the Evans entities could have been cured by an instruction to the jury had such a request been made. In either instance, we conclude that the trial court acted within its discretion to deny the admission of evidence and the Evans entities' motion for mistrial. We overrule the Evans entities' fifth issue.

## IV. *Evidentiary Rulings at Trial*

In their sixth issue, with three sub-issues, the Evans entities argue that the trial court reversibly erred in excluding expert testimony and evidence on their claim for interest owed for nonpayment of royalties, and the amount of attorney's fees incurred in pursuit of their claims.

### A. *Standard of Review and Applicable Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Owens-Corning Fiberglas*, 972 S.W.2d at 43. As previously stated, "[w]ithout awaiting a discovery request, a party must provide to the other parties . . . the amount and any method of calculating economic damages." TEX. R.

29

CIV. P. 194.2(b)(4). Pursuant to Rule 193.5, the duty to supplement or amend arises when a party learns that its previous responses to written discovery were incomplete or incorrect when made or are no longer complete or correct. *Id.* R. 193.5(a). The responding party must amend or supplement its discovery responses to the extent that (1) "the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses," and (2) "the written discovery sought other information, unless the additional or corrective information [was] made known to the other parties in writing, on the record at a deposition, or through other discovery responses." *Id.* Further, if an expert witness is retained by, employed by, or otherwise under the control of a party, the party must amend or supplement any deposition testimony and report made by the expert with regard to the expert's mental impressions or opinions and the basis for them. *Id.* R. 195.6.

Under Rule 193.6, discovery that is not timely disclosed is inadmissible. *Id.* R. 193.6(a); *Gillenwater*, 285 S.W.3d at 881. Again, there is an exception to excluding the evidence if the trial court finds that the proponent of the evidence establishes that: (1) there was good cause for the failure to disclose the evidence; or (2) the failure will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6.

B. *Interest on Late Payment of Royalties*

In their first sub-issue, the Evans entities argue that the trial court abused its discretion in refusing to allow them to present evidence on the amount of interest owed by Diamondback under the lease for the late payment of royalties because the Evans entities (1) met their burden of pretrial disclosure and (2) demonstrated the evidence would not unfairly surprise or unfairly prejudice Diamondback.

At trial, the Evans entities offered Paul Evans's testimony regarding contract-interest calculations. Outside the presence of the jury, Paul testified that he created a spreadsheet to perform his analysis and that he calculated the damages to be

approximately $1.23 million. Diamondback objected to Paul's testimony on the grounds that the information was requested but not disclosed in discovery. Diamondback requested all documents, notes, and calculations supporting any such damages. The Evans entities only disclosed that it planned on calculating interest on any late payments of royalty at the rate of ten percent per annum as set out in the lease. The trial court sustained Diamondback's objection.

The Evans entities did not meet their burden of disclosure by merely referencing the interest rate set out in the lease. As Diamondback points out, it is not clear "how Diamondback could have meaningfully cross-examined [Paul] on $1.23 million worth of never-disclosed calculations on a never-disclosed spreadsheet relating to month-by-month royalties on 29 separate wells over the course of years." We conclude that the trial court did not abuse its discretion in excluding this evidence on the bases that it was not timely disclosed and its admission would cause unfair surprise or unfair prejudice. *See Owens-Corning Fiberglas*, 972 S.W.2d at 43; *see also Didur-Jones v. Family Dollar, Inc.*, No. 02-09-00069-CV, 2009 WL 3937477, at *4 (Tex. App.—Fort Worth Nov. 19, 2009, pet. denied) (mem. op.) (finding no abuse of discretion in excluding evidence of damages and observing that "[i]t is undisputed that [the appellant] failed to formally supplement her response to the portion of [the appellee's] request for disclosure seeking the amount and method of calculating economic damages" and that there was nothing in the record demonstrating the reason the appellant could not timely disclose such damages). We overrule this sub-issue.

C. *Expert Testimony*

In their second sub-issue, the Evans entities argue that the trial court erred in partially excluding the testimony of two of their experts: Graham and Smith. As stated above, Graham generally testified that the royalties were miscalculated because Diamondback calculated the minerals' market value at the wrong location

under the lease. And Smith testified regarding his opinion on damages for Diamondback's failure to account for cotenant wells. Shortly before trial, both experts effectively doubled their damages calculations. Graham increased his calculation from $422,905.92 to $793,118.83, and Smith from $371,000 to $790,000. Diamondback objected to the portions of their opinions that had changed, which the trial court sustained. The trial court thereafter allowed Graham and Smith to provide testimony on damages, which related to their opinions that were timely disclosed.

The Evans entities argue that the trial court's ruling is an abuse of discretion because they had no duty to supplement the opinions of these experts. They contend that the changes to each expert's testimony were refinements or expansions of a previously disclosed opinion and that the changes were in response to documents produced by Diamondback in discovery, so there could be no unfair surprise to Diamondback.

We need not address whether the trial court abused its discretion in excluding this evidence, because the Evans entities cannot show that they were harmed by the ruling. A trial court's erroneous exclusion of evidence is harmful when it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1. In other words, the error "can be said to have contributed in a substantial way to bring about the adverse judgment." *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018) (internal quotation marks omitted). In determining whether the exclusion of evidence was harmful, we review the entire record. *Id.* "Whether an erroneous exclusion of evidence probably caused the rendition of an improper judgment is 'a judgment call entrusted to the sound discretion of good sense of the reviewing court from an evaluation of the whole case.'" *City of Stephenville v. Belew*, 692 S.W.3d 347, 361 (Tex. App.—Eastland 2024, pet. denied) (quoting *First Emps. Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983)).

32

Because the jury concluded that Diamondback did not breach the lease's royalty provisions, it did not reach the question of how much Diamondback allegedly underpaid. Thus, the Evans entities could not have been harmed by the exclusion of Graham's supplemental damages opinion. *See Manon v. Solis*, 142 S.W.3d 380, 392 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (concluding that exclusion of testimony regarding damages did not result in the rendition of an improper judgment because the jury did not reach the issue). And while the jury found that Diamondback failed to account for cotenant wells, it follows that the jury also determined that the Evans entities did not prove the damages they allegedly sustained. The supplementation of Smith's expert opinion would not have changed the jury's finding. If the jury rejected Smith's testimony that the Evans entities sustained damages for the failure to account for cotenant wells, it is of no consequence whether Smith's damages calculation was $371,000 or $790,000. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995) ("A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted."); *Nezat v. Tucker Energy Servs., Inc.*, 437 S.W.3d 541, 545 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[A]ny error by the trial court in excluding the seven permits on relevance grounds was harmless as the jury verdict, and thus the judgment based on that verdict, did not turn on the excluded evidence."). We overrule this sub-issue.

D. *Attorney's Fees*

In their third sub-issue, the Evans entities argue that the trial court reversibly erred in excluding evidence of their incurred attorney's fees. In discovery, Diamondback requested "all documents supporting any claim for attorneys' fees, including but not limited to engagement letters, invoices, and proof of payment," which the Evans entities never provided. The Evans entities informed the trial court

that they did not intend to present evidence of attorney's fees to the jury but would instead seek a fee award from the trial court at another time. Diamondback objected to a bifurcated trial, and the Evans entities then confirmed that they would not present fee evidence to the jury:

> THE COURT: So you're not going to present any evidence at trial on attorney's fees?
>
> [THE EVANS ENTITIES]: On the quantification of attorney's fees, no. That's correct.
>
> THE COURT: Well, that's that.

The Evans entities later attempted to present the undisclosed attorney's fee evidence at trial, and the trial court ruled that they could not present the evidence that they had failed to produce in discovery.

The Evans entities sought attorney's fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code. Section 38.001(b)(8) provides that a party "may recover reasonable attorney's fees from an individual or organization . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8) (West Supp. 2024). "To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995)). The Evans entities did not receive favorable jury findings and thus did not recover any damages for their breach-of-contract claims. Therefore, they were not entitled to attorney's fees. *See id.* Accordingly, they were not harmed by the exclusion of such evidence. *See* TEX. R. APP. P. 44.1. We overrule this sub-issue. Having overruled each sub-issue, we overrule the Evans entities' sixth issue in its entirety.

## V. *Sufficiency of the Evidence*

In their seventh and eighth issues, the Evans entities argue that the evidence is factually and legally insufficient to support the jury's answers to Question Nos. 1 and 4.

### A. *Standard of Review*

Under a legal sufficiency review, we consider all the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807, 822, 827. Evidence is legally insufficient to support a jury finding when (1) the record bears no evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). "When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Shields Ltd. P'Ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (first citing *Mo. Pac. R. Co. v. Limmer*, 299 S.W.3d 78, 84 n.30 (Tex. 2009); and then citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)). We cannot substitute our judgment for that of the factfinder if the evidence falls within the zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

To successfully challenge the factual sufficiency of the evidence to support an adverse finding on an issue on which it bore the burden of proof at trial, the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must consider and weigh all the evidence

and will set aside a verdict only if it is so contrary to the overwhelming weight of the evidence such that it is clearly wrong and manifestly unjust. *Dow Chem.*, 46 S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). It is the factfinder's role to evaluate the credibility of the witnesses and reconcile any inconsistencies or conflicts in the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Generally, the factfinder may believe or disregard all or any part of the testimony of any witness. *Id.* at 774–75. We will not substitute our opinions on credibility for those of the factfinder. *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

## B. *Underpayment of Royalties Claim*

In their seventh issue, the Evans entities challenge the jury's answer to Question No. 1, which asked whether Diamondback "fail[ed] to pay royalties in accordance with the terms of Section 4 of the Evans Lease."

### 1. *Pertinent Facts*

The lease provides a royalty on oil of 1/4 "of the market value at the point of Lessee's disposition." "Disposition" is defined as "the transaction, place and point in time whereby Lessee and its Affiliates finally and fully relinquish any beneficial ownership, rights or enjoyment of any substance produced." "Affiliate" is defined as an "entity that owns or controls" the lessee or that the lessee "owns or controls" at a rate of "more than ten percent (10%) of the outstanding voting securities or interest." Thus, the royalty on oil is 1/4 of the oil's market value at the point when the lessee or its affiliate relinquishes ownership of the oil.

Regarding gas, if the lessee processes the gas in a location in which it has no interest, the royalty is:

> [O]ne-fourth (1/4) of the market value at the point of disposition of Lessee's liquids of all processed liquids credited to the account of Lessee and attributable to such gas, plus one-fourth (1/4) of the market value of all residue gas at the point of sale, use or other disposition.

36

If the lessee processes the gas in a location in which it or a parent or subsidiary has an interest, the royalty is the greater of:

> (a) one-fourth (1/4) of the market value of such gas at the inlet to the processing plant, or (b) one-fourth (1/4) of the market value of all processed liquids saved from said gas at the point of disposition for Lessee's share of processed liquids, plus one-fourth (1/4) of the market value of all residue gas at the point of sale, use or other disposition.

And if the lessee sells the gas without first processing it, the royalty is "one-fourth (1/4) of the market value at the point of use or other disposition of all such gas."

Accordingly, the amount of royalty to be paid on produced oil and gas was dependent on the market value at the "point of disposition"—a key phrase, the meaning of which the parties disagreed. The Evans entities' expert witness, Graham, testified that because Diamondback transferred *crude oil* to an alleged affiliate, Vitol, which sold it to a third party on the gulf coast, the point of disposition was the gulf coast. Graham stated that Diamondback and Vitol have a joint venture as to the project of transporting oil under the lease. Consequently, Graham opined that the royalties were miscalculated and underpaid because the minerals' market value was calculated from the wrong location under the lease. As we have said, Graham calculated an underpayment of $229,508.49 in crude oil royalties.

Graham testified that the *gas* was processed at the Sale Ranch Gas Plant and that Diamondback has a direct interest in that facility. Graham opined that different lease provisions apply when Diamondback has a direct interest in the plant used to process the natural gas produced under the lease. Graham opined that the royalty calculation should have begun at the processing plant because the value of the gas at the plant was higher than the value at the point of sale.

Graham testified that Diamondback paid royalty on only eighty-seven percent or, at times, ninety percent of production. Graham testified that this was an

underpayment because, under the lease, the Evans entities are entitled to 1/4 of the market value of *all* residue gas at the point of sale used for disposition. Graham stated that a deduction of either thirteen or ten percent should have been added to the proceeds, resulting in an underpayment by Diamondback of $103,897.13 in royalties.

However, Diamondback's expert, Angela Paslay, testified that Diamondback sold the oil and gas near the wellhead, which was in Midland County. Paslay testified that Diamondback has not underpaid royalties. Rather, the Evans entities have been paid in accordance with the lease but in excess of the Evans entities' ownership in the actual proceeds of the sales.

Paslay explained that the *gas* was sold under three contracts. Under each, the point of sale was the sales meter immediately downstream of the tank batteries. At that location, Paslay explained, money exchanged hands and title to the raw, unprocessed gas transferred to the purchaser.

Paslay explained that *oil* was sold under contracts with two purchasers. For each, the primary point of sale was at the "LACT" meters just downstream from the tank batteries. Paslay opined that it was at that location that custody and title of the *oil* transferred to the purchaser.

According to Diamondback's payment records, Paslay explained that Diamondback paid the Evans entities its 1/4 royalty from the minerals' sales proceeds—at the point of sale—as required by the lease. She explained that when Diamondback incurred fees on the produced minerals, it did not pass on those fees to the Evans entities. Because of this, Paslay opined that Diamondback overpaid royalties to the Evans entities. Responding to Graham's opinions, Paslay stated that the purchasers were independent third parties, and neither Diamondback nor any of its affiliates owned the minerals after the point of sale. Therefore, the royalty

38

valuation point for both the oil and gas sold by Diamondback was just downstream from the tank batteries in Midland County.

### 2. *Analysis*

The Evans entities argue that they "proved as a matter of law three separate ways in which they were underpaid for royalties owed under the Lease," and that "[t]he record shows the total underpayment for crude oil and for natural gas totaled $333,405.62." Diamondback responds that the lease sets royalty based on the point of disposition, and that Diamondback correctly paid the Evans entities' share at the point of sale.

The lease language sets the amount of the royalty to be paid at the point of disposition, and while there is conflicting testimony on the correct point of disposition, we must defer to the jury's assessment of the evidence and the credibility of the witnesses and the jury's reconciliation of conflicting evidence. *See Golden Eagle Archery*, 116 S.W.3d at 761. In that regard, Paslay reviewed all the relevant payment records and concluded that Diamondback correctly calculated royalties at the point of sale because the purchasers were independent third parties, and neither Diamondback nor any of its affiliates owned the minerals after the point of sale. This constitutes more than a mere scintilla of evidence in support of the jury's finding, and the record does not conclusively establish all vital facts in support of an opposite finding. *See Shields*, 526 S.W.3d at 480; *Uniroyal Goodrich Tire*, 977 S.W.2d at 334.

Graham testified that even though Diamondback had already sold the minerals to an unaffiliated third-party, if Diamondback had a greater than ten percent ownership in the pipeline transporting the minerals then market value must be calculated at the gulf coast. If we were to assume that theory is correct, which we need not decide, the Evans entities failed to conclusively prove it. When asked if he knew whether Diamondback had acquired an interest in the pipeline before or after

transporting the minerals, Graham testified that he did not. Further, Paslay offered conflicting testimony as to each of Graham's opinions on the underpayment of royalties. After considering and weighing all the evidence, we cannot conclude that the jury's finding is so contrary to the overwhelming weight of the evidence such that it is clearly wrong and manifestly unjust. *See Dow Chem.*, 46 S.W.3d at 242. We hold that the jury's answer to Question No. 1—that Diamondback did not fail to pay royalties in accordance with the lease agreement—is supported by legally and factually sufficient evidence. We overrule the Evans entities' seventh issue.

C. *Damages for Failure to Account for Cotenant Wells*

In their eighth issue, the Evans entities challenge the sufficiency of the evidence supporting the jury's answer to Question No. 4, that the Evans entities sustained no damages resulting from Diamondback's failure to account to them for the royalties on cotenant wells once that portion of the lease expired.

1. *Pertinent Facts*

The cotenancy claim alleges that with respect to some acreage and depths, the Evans entities were improperly paid as a lessor rather than an unleased cotenant. The Evans entities' expert, Smith, testified that Diamondback drilled twenty-nine horizontal wells just north of Section 8. The lateral section of the wells ran 13,000 feet in length and traveled under Section 8, under another section to the south, and under half of a section further south. Smith testified that the lease had terminated as to some depths and areas of Section 8 per the lease terms such that Evans Resources was now a cotenant and entitled to all the revenue less expenses. As we have said, Smith opined that, in areas where Evans Resources was treated as having a royalty interest rather than being a cotenant, it was underpaid $337,000. The Evans entities did not offer any underlying documentation for Smith's damage figure or other evidence to support his conclusions.

Regarding Smith's testimony, Diamondback argued to the jury:

> But here's what you don't know from his testimony, and this is where you get to the burden of proof. Here's what you don't know, you don't know what the volumes were he used. He didn't tell you that. You don't know what months he used. You don't know volume by month.

Diamondback continued, "If you're convinced he did everything exact, you think you got a full explanation of how he got this number and you're convinced it's right, okay. But if you're not, the number is zero."

The jury answered "yes" to Question No. 3, whether Diamondback "fail[ed] to account to Evans Resources as a mineral cotenant." However, in answering Question No. 4, "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate Evans Resources for Diamondback's failure to account," the jury answered "$0." Importantly, as to Question No. 4, the jury was given two specific instructions from the trial court:

> A cotenant who produces minerals from common property without having secured the consent of his cotenants must account to them on the basis of the proportionate market value of the product minus the proportionate necessary and reasonable costs of producing and marketing the product.

> Consider the difference between (1) the amount Evans Resources is owed as a mineral cotenant in the portions of the horizontal wells as to which the Evans Lease terminated, and (2) the royalties Evans Resources was paid on those same portions of the horizontal wells.

### 2. *Analysis*

While we cannot look into the collective minds of the jury nor can we ascertain the reasons the jury answered the questions as it did, there are plausible reasons why it might have done so, including dutifully basing their answers upon the evidence presented and not presented when applied to the instructions given. The closing argument of Diamondback's trial counsel appears to have been directed to the first instruction, namely, it does not appear that the Evans entities' expert

provided the basis upon which the jury could award damages—"the proportionate market value of the product minus the proportionate necessary and reasonable costs of producing and marketing the product." Without that information, the jury may have reasonably concluded that the Evans entities did not carry their burden of proof on damages. Further, in light of the testimony of Paslay that the Evans entities had actually been *overpaid* royalties, the jury may have believed that an offset was just.

The Evans entities argue that the evidence is uncontroverted that they sustained damages in the amount of $337,000 from Diamondback's failure to account for profits from cotenant wells. Accordingly, they posit that the evidence is factually and legally insufficient to support the jury's determination that they sustained no damages. But contrary to the Evans entities' argument, a jury may disbelieve any witness, even if the witness's testimony is uncontradicted. *Grant v. Cruz*, 406 S.W.3d 358, 364 (Tex. App.—Dallas 2013, no pet.). "Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone." *City of Keller*, 168 S.W.3d at 819–20; *see Uniroyal Goodrich Tire*, 977 S.W.2d at 339 ("We conclude that the jury could properly determine whether the rim as designed was unreasonably dangerous, and that it was not required to follow expert testimony on this issue."); *see also Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 118 & n.3 (Tex. App.—Beaumont 2005, pet. denied) (noting that "*Uniroyal* is one of a multitude of cases under Texas law in which expert testimony regarding a subject was not binding on the jury").

Giving due deference to the jury's role in determining the credibility of witnesses, as we must, and acknowledging the lack of detail and supporting documentation for Smith's testimony, we cannot say that the record conclusively establishes that the Evans entities sustained damages or that the amounts claimed were definitively proven on their cotenancy claim. *See Shields*, 526 S.W.3d at 480; *Golden Eagle Archery*, 116 S.W.3d at 761; *see also Int'l Med. Ctr. Enters., Inc. v.*

42

*ScoNet, Inc.*, No. 01-16-00357-CV, 2017 WL 4820347, at *12 (Tex. App.—Houston [1st Dist.] Oct. 26, 2017, no pet.) (mem. op.) (concluding it would not be unreasonable for the jury to disregard or disbelieve all or some of expert's testimony given the lack of detail and documentation supporting damages calculations). Neither can we conclude that the jury's finding is so contrary to the overwhelming weight of the evidence such that it is clearly wrong and manifestly unjust. *See Dow Chem.*, 46 S.W.3d at 242. We hold that the evidence is legally and factually sufficient to support the jury's answer to Question No. 4. We overrule the Evans entities' eighth issue.

## VI. *This Court's Ruling*

We affirm the trial court's judgment.

W. BRUCE WILLIAMS
JUSTICE

October 23, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.